[No. A019818. First Dist., Div. Two. Mar. 27, 1985.]

GREENLAW GRUPE, JR., et al., Plaintiffs and Respondents, v.
CALIFORNIA COASTAL COMMISSION et al.,
Defendants and Appellants.

**COUNSEL**

Dennis J. Kehoe and Adams, Levin, Kehoe, Bosso, Sachs & Bates for Plaintiffs and Respondents.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, N. Gregory Taylor, Assistant Attorney General, and Linus Masouredis, Deputy Attorney General, for Defendants and Appellants.

## OPINION

## KLINE, P. J.—

### INTRODUCTION

The California Coastal Commission and the State of California appeal from a judgment for damages and a judgment granting a writ of mandamus ordering the Coastal Commission to remove from a new development permit a condition requiring respondent to offer to dedicate a public access easement along the beach fronting his property. We examine the disputed condition and conclude that it was properly imposed and does not offend applicable constitutional principles. We therefore reverse the judgments accordingly.

### FACTS

This case concerns the validity of a condition imposed on a permit for coastal development issued by the Central Coastal Regional Commission (Regional Commission) of the California Coastal Commission. The subject property—a beachfront residential lot in the Aptos area of Santa Cruz County—was purchased by respondent Greenlaw Grupe[1] in September of 1979. The lot covers approximately 15,250 square feet and is located just seaward of Beach Drive in Aptos. Respondent's lot is one of 29 lots seaward of Beach Drive, and, in 1980, was one of only six undeveloped lots in that area. The Beach Drive enclave is a private "locked gate" residential community. Beach Drive itself is a dead end street; to gain access to the beach front homes along the drive, it is necessary to pass through a privately maintained gate at the north end of the enclave. (A map of the Beach Drive Area is set forth in the Appendix to this opinion.)

The Beach Drive enclave is between two beaches open to public use— Seacliff State Beach to the north and Seascape Beach to the south. (See *Aptos Seascape Corp.* v. *County of Santa Cruz* (1982) 138 Cal.App.3d 484, 500, at fn. 7 [188 Cal.Rptr. 191].) The beach above the mean high tide line in front of the Beach Drive enclave, however, is privately owned, and signs proclaiming "Private Beach" are posted along the boundaries between the public and private beaches to discourage trespassing.

In December of 1979 Grupe applied to the Regional Coastal Commission for a permit to build a large single-family home on his lot. The home was

---

[1]Title to the property is actually vested in The Greenlaw Grupe, Jr. Operating Company, which is a partnership wholly owned by respondent Greenlaw Grupe, Jr. and his wife. For the sake of simplicity, and since the form of ownership has no bearing on the issues in this case, the respondents in this case will be referred to as "Grupe" or "respondent."

to be built behind a cement seawall on the landward third of the lot and involved total coverage of 5,500 square feet.

The Coastal Commission staff recommended approval of the permit, subject to a number of conditions. One of the recommended conditions, condition 3.d, provided as follows: "The Executive Director shall certify in writing that the following condition has been satisfied. The applicant shall execute and record a document, in a form and content approved in writing by the Executive Director of the Commission irrevocably offering to dedicate to a public agency or a private association approved by the Executive Director, *an easement for public access and passive recreational use along the shoreline.* Such easement shall be from the cement retaining wall seaward to the mean high tide line. Such easement shall be recorded free of prior liens except for tax [liens] and free of prior encumbrances which the Executive Director determines may affect the interest being conveyed. This area shall be mapped and attached as an exhibit to the recorded document. [¶] The offer shall run with the land in favor of the People of the State of California, binding successors and assigns of the applicant or landowner. The offer of dedication shall be irrevocable for a period of 21 years, such period running from the date of recording." (Italics added.)

The Coastal Commission's Public Access Interpretative Guidelines define "passive recreational uses" as used in the condition as all activities normally associated with beach use *except* for organized sports activities, campfires, or vehicular access for other than emergency or maintenance purposes. The area covered by the easement—from the cement retaining wall to the mean high tideline—was found by the trial court to encompass approximately 8,000 to 10,000 square feet, or approximately two-thirds of the total area of respondent's lot.

At the hearing before the Regional Commission respondent was represented by his architect, who objected to condition 3.d. In addition, representatives of the local homeowners association and improvement association spoke at the hearing and also objected to the condition. After these objections were expressed there followed a lengthy debate among the commissioners and staff concerning the propriety of the condition. A motion was made to delete the condition, but was rejected. The Regional Commission then approved the development permit, subject to condition 3.d.

Subsequently, respondent appealed the Regional Commission's decision to the State Coastal Commission which found that the appeal did not raise

a substantial issue and therefore let the Regional Commission's decision stand.

Respondent then filed the present action in the Santa Cruz Superior Court alleging two causes of action. The first cause of action was for administrative mandamus pursuant to Code of Civil Procedure section 1094.5 and sought invalidation of condition 3.d on a variety of grounds. The second cause of action presented a claim for damages for violation of federal constitutional rights under section 1983, title 42, of the United States Code on the ground, inter alia, that the condition amounted to an unconstitutional taking of respondent's property without compensation in violation of the Fifth and Fourteenth Amendments.

The second cause of action for alleged violation of respondent's constitutional rights has generated protracted trial court and appellate writ proceedings which have complicated the procedural history of this case. Appellants contend—and have contended throughout the proceedings below—that the state Coastal Commission, its regional agencies, and the State of California cannot be sued for damages under section 1983 since they are not "persons" within the meaning of that section.[2] After appellants' demurrer and motion for judgment on the pleadings as to the second cause of action were denied, appellants sought an extraordinary writ in the Court of Appeal dismissing the federal civil rights claim. This court stayed trial of the federal civil rights claim and later issued an alternative writ. However, after oral argument, the court declined to rule on the merits and dismissed the writ on the ground that the alternative writ had been improvidently granted.

The appellate proceedings in this case effectively severed the federal civil rights claim from the administrative mandamus claim. Because the administrative mandamus claim was not stayed, that cause of action was tried in October of 1980 before Santa Cruz Superior Court Judge Donald O. May. The claim was tried solely on the basis of the administrative record; no additional evidence was produced at trial. After arguments were presented, Judge May found in favor of respondent, holding that imposition of condition 3.d amounted to an abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).) Although Judge May's opinion detailing his decision is some-

---

[2]Section 1983 provides: "Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia." (42 U.S.C. § 1983, italics added.)

what ambiguous, it appears he concluded that: (1) the Regional Commission did not proceed in the manner required by law (§ 1094.5, subd. (b)) because condition 3.d "could not reasonably carry out the purposes for which the Coastal Commission was created," and (2) the decision to impose condition 3.d was not supported by the findings since the Commission did not find that similar conditions would be applied with respect to the remaining parcels along the beach.[3]

Following Judge May's decision,[4] the parties entered into an agreement whereby the Regional Commission allowed respondent to construct his home on the parcel, and respondent agreed to execute the offer of dedication as required by condition 3.d and to hold the offer in escrow pending the final outcome of this litigation. Construction began in June of 1981, and the home was completed in December of 1981.

The federal civil rights claim was finally tried in July of 1982 before Judge Roland K. Hall. This trial was not limited to the administrative record and extensive evidence was presented by both sides. At the trial, appellants attempted to prove that the private beach in front of the Beach Drive enclave had been impliedly dedicated because of longstanding public use (see *Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29 [84 Cal.Rptr. 162, 465 P.2d 50]), and that condition 3.d therefore did not affect a property interest vested in respondent, since respondent's rights to the beach had already been impliedly dedicated to the public. Respondent, of course, resisted this contention and claimed that (1) condition 3.d amounted to an unconstitutional taking of his property without just compensation; and (2) the condition denied him substantive due process.

After a two day trial, Judge Hall found in favor of respondent and awarded him $150,000 in damages unless condition 3.d was stricken by the Coast-

---

[3]Judge May's opinion, as pertinent, read as follows: "Requirements for dedication of a portion of an applicant's property has been long recognized by planning departments as a tool in carrying out legitimate purposes of planning. A municipality often will require a dedication for purposes of widening a street as a condition of granting a building permit. However, in the instant case, none of the owners of houses on this strip of beach frontage, and in particular the owners of the adjacent improved lots, have so offered to dedicate or been required to offer to dedicate to public use the beach in front of their respective seawalls. In the absence of a substantial disaster with major damage to the adjacent houses, the owners of the houses would not have to go before the Coastal Commission for any permit and therefore the Coastal Commission cannot expect with any reasonable degree of certainty to be able to impose a similar condition on the property of the adjacent owners. [¶] I therefore hold that the imposition of condition 3d as applied to the petitioners is unwanted [*sic*] and could not reasonably carry out the purposes for which the Coastal Commission was created. Therefore such act of imposing condition 3d is an abuse of administrative discretion."

[4]Appellant appealed directly from Judge May's decision, but this appeal was dismissed for lack of a final judgment since the federal civil rights claim had yet to be tried.

al Commission within 90 days. Specifically, Judge Hall found that: (1) Both the State of California and the California Coastal Commission are "persons" within the meaning of section 1983 and both are amenable to a suit for damages under that statute; (2) condition 3.d amounted to a taking of private property for a public purpose without just compensation in violation of the Fifth and Fourteenth Amendments; (3) condition 3.d violated substantive due process because the means employed by the Regional Commission were "neither reasonably nor rationally related to the end sought to be achieved"; (4) the Regional Commission contravened "the principle of fundamental fairness" expressed by the Fifth and Fourteenth Amendments by imposing condition 3.d; and (5) there is no implied public easement over respondent's beach. In addition, the court found that the location of the mean high tide line along respondent's parcel is reasonably certain, and that condition 3.d, if accepted, would create an easement covering between 8,000 and 10,000 square feet of respondent's property.

Judge May awarded respondent $8,652.50 in costs and Judge Hall awarded respondent $20,000 in attorney's fees pursuant to section 1988, title 42, of the United States Code.

This appeal followed.

## DISCUSSION

### I

A. *Statutory & Constitutional Mandate for Access Conditions*

Before we turn to the specific constitutional and administrative issues raised in this appeal, it will be useful to first examine the Coastal Commission's constitutional and statutory mandate to exact access dedications as a condition of development.

Article X, section 4, of the California Constitution provides: "No individual, partnership, or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary, or other navigable water in this State, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the Legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this State shall be always attainable for the people thereof."

In order to carry out the mandate of the constitutional provision just quoted, the Legislature enacted several access statutes as part of the Coastal Act

of 1976. (Comment, *Public Beach Access Exactions: Extending the Public Trust Doctrine to Vindicate Public Rights* (1981) 28 UCLA L.Rev. 1049, 1066-1067.)[5] These statutes—sections 30210 through 30214 of the Public Resources Code—are grouped together in the 1976 Act under the heading "Public Access."

Section 30210, as amended in 1978, provides: "In carrying out the requirement of Section 4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse."

Section 30211 provides in essence that development shall not interfere with the public's right of access to the sea. Sections 30212.5 and 30213 provide for the distribution of facilities to mitigate the impacts of overcrowded beaches and encourage the development and protection of low cost recreational facilities along the coast. Section 30214 expresses the intent of the Legislature regarding the implementation of public access policies, particularly with respect to the "time, place, and manner" of particular access provisions.

Most important to the issues presently under consideration, section 30212 empowers the Coastal Commission to exact access dedications as a condition of approval for "new development projects" along the coast. (*Liberty* v. *California Coastal Com.* (1980) 113 Cal.App.3d 491, 500 [170 Cal.Rptr. 247].) Subdivision (a) of section 30212 as amended through 1983 provides: "Public access from the nearest public roadway to the shoreline and along the coast *shall* be provided in new development projects except where (1) it is inconsistent with public safety, military security needs, or the protection of fragile coastal resources, (2) adequate access exists nearby, or (3) agriculture would be adversely affected. Dedicated accessway shall not be required to be opened to public use until a public agency or private association agrees to accept responsibility for maintenance and liability of the accessway." (Italics added.)

---

[5]The Coastal Act of 1976 (Pub. Resources Code, §§ 30000-30900) was enacted by the State Legislature to implement the policies and recommendations of the California Coastal Zone Conservation Plan prepared by the California Coastal Commission pursuant to Proposition 20 (the 1972 Coastal Initiative). The 1976 Coastal Act replaced the original Coastal Act of 1972 when that Act expired by its own terms at the end of 1976. (Comment, *Public Access and the California Coastal Commission: A Question of Overreaching* (1981) 21 Santa Clara L.Rev. 395, fn. 1.) For a more detailed history of California coastal legislation, see *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 162-163 [188 Cal.Rptr. 104, 655 P.2d 306].

■ Unquestionably, the construction of respondent's home is a "new development project" within the meaning of section 30212.[6] ■ In addition, it should be noted that section 30212, subdivision (a), is mandatory—it provides that access *shall* be provided in new development projects *unless* three specific exceptions apply. Finally, section 30212, subdivision (a), provides for two kinds of access: "vertical" access, that is, access from the nearest public roadway to the sea; and "lateral" access, that is, access along the coast. (Comment, *supra,* 28 UCLA L.Rev. at 1068, fn. 162; see also, *Georgia-Pacific Corp.* v. *California Coastal Com., supra,* 132 Cal.App.3d 678, wherein the court defines a lateral access easement as one running "roughly parallel to the shoreline," and a vertical access easement as one running "roughly perpendicular to it." (*Id.,* at p. 687, fn. 4.)) The parties agree that condition 3.d involves a lateral access easement only.

## B. *Respondent's Attack on Coastal Commission Guidelines*

In order to implement the public access provisions of the 1976 Act, the State Coastal Commission promulgated guidelines interpreting those provisions. (Pub. Resources Code, § 30620, subd. (a)(3); *Pacific Legal Foundation* v. *California Coastal Com., supra,* 33 Cal.3d at p. 163.) These guidelines are entitled "Statewide Interpretive Guidelines [¶] Public Access

---

[6]In 1979 the Legislature amended section 30212 to specify certain activities which are *not* "new development projects." (See *Georgia-Pacific Corp.* v. *California Coastal Com.* (1982) 132 Cal.App.3d 678 [183 Cal.Rptr. 395].) Section 30212, subsection (b) now provides:

"(b) For purposes of this section, 'new development' does not include:

"(1) Replacement of any structure pursuant to the provisions of subdivision (g) of Section 30610 [involving replacement of structures destroyed by disaster],

"(2) The demolition and reconstruction of a single-family residence; provided, that the reconstructed residence shall not exceed either the floor area, height or bulk of the former structure by more than 10 percent, and that the reconstructed residence shall be sited in the same location on the affected property as the former structure.

"(3) Improvements to any structure which do not change the intensity of its use, which do not increase either the floor area, height, or bulk of the structure by more than 10 percent, which do not block or impede public access, and which do not result in a seaward encroachment by the structure.

"(4) The reconstruction or repair of any seawall; provided, however, that the reconstructed or repaired seawall is not seaward of the location of the former structure.

"(5) Any repair or maintenance activity for which the commission has determined pursuant to Section 30610, that a coastal development permit will be required unless the commission determines that the activity will have an adverse impact on lateral public access along the beach.

"As used in this subdivision, 'bulk' means total interior cubic volume as measured from the exterior surface of the structure."

Clearly, the construction of respondent's home does not fall into any of these exceptions.

In *Georgia-Pacific Corp., supra,* the court relied on section 30106 of the Public Resources Code to define "development" as the erection of a structure on land, or the construction of a structure, or both. The court applied the usual every day meaning to "new" and "project." (*Georgia-Pacific Corp.* v. *California Coastal Com., supra,* 132 Cal.App.3d at p. 698.) The construction of a single-family dwelling is clearly a "new development project" as that term is defined in *Georgia-Pacific,* and used in section 30212.

(Shoreline)" (hereinafter Access Guidelines) and are part of the administrative record before us. (*Georgia-Pacific Corp.* v. *California Coastal Com.*, *supra,* 132 Cal.App.3d at p. 694.) The guidelines specifically sanction forced dedication of easements for "passive and recreational uses" such as the easement under consideration here. In fact, the guidelines maintain that under most circumstances, access dedicated pursuant to section 30212 should *at least* allow for passive recreational uses—that is, recreational activities normally associated with beach use except organized sports, campfires, and vehicle access.[7]

---

[7]The Access Guidelines define three types of access conditions: "pass and repass," "passive and recreational uses," and "active recreational uses." The guidelines also explain under what circumstances a particular form of access is appropriate:

"*Types of uses of an accessway.* In accord with Section 30214 of [the Public Resources Code], in determining the amount and types of uses appropriate for a given accessway, consideration should be given to the protection of habitat values of the site, topographic constraints of the site, the recreational needs of the public and the privacy rights of the landowner. Restrictions on uses of accessways dedicated in accordance with permit conditions may be imposed by the accepting agency/association with the approval of the Executive Director to provide for more effective maintenance of the accessway. Example[s] of use limitations are:

"*Pass and repass.* Where topographic constraints of the site make use of the beach dangerous, where habitat values of the shoreline would be adversely impacted by public use of the shoreline or where the accessway may be limited to the right of the public to pass and repass along the access area. For the purposes of these guidelines, pass and repass is defined as the right to walk and run along the shoreline. This would provide for public access along the shoreline but would not allow for any additional use of the accessway. Because this severely limits the public's ability to enjoy the adjacent state owned tidelines by restricting the potential use of the access areas, this form of access dedication should be used only where necessary to protect the habitat values of the site, where topographic constraints warrant the restriction, or where it is necessary to protect the privacy of the landowner.

"*Passive and recreational uses.* Passive recreational uses include those activities normally associated with beach use (e.g., walking, swimming, jogging, sunbathing, fishing, surfing). This *does not include* use of the accessway for organized sports activities, campfires, or vehicular access for other than emergency or maintenance purposes. *Most accessways* required to meet the provisions of Section 30212 of the [Public Resources Code] *should provide for at least this range of uses* unless the topographic constraints, habitat values, or privacy needs warrant more restrictive provisions on the use of the accessway. More restrictive uses such as limitations in hours or restrictions on use during specific seasons in order to protect habitat values may be included where such site specific impacts have been identified.

"*Active recreational uses.* Recreational uses include the full range of beach oriented activities. This type of use of a given accessway may be required where the burdens of the proposed projects would severely impact public recreational use of the shoreline, where the proposed development is not one of the priority uses specified in Section 30222 [of the Public Resources Code], where the uses reflect the historic public use of the parcel . . . where the uses allowed would be consistent with the use of the proposed project (e.g. where the proposed development is for a commercial or visitor serving facility or a large subdivision where the beach area is proposed as a recreation center for the subdivision, etc.), and where such uses would not significantly interfere with the privacy of the landowner. (e.g. where the project is sited on a bluff above the accessway, or where the project is physically separated from the accessway by dunes, or a retaining device, etc.). The accepting agency/association with the concurrence of the Executive Director may restrict some of these uses to facilitate maintenance of these accessways."

■ Respondent contends the State Coastal Commission exceeded its statutory authority by promulgating guidelines which allow property to be exacted for recreation as well as for simple access. In other words, respondent reads section 30212 as allowing the Commission to exact only *rights of way* to and from or along the coast; he maintains that section 30212 and the other access statutes do not authorize the State or Regional Coastal Commissions to require exactions for recreational purposes. Under respondent's interpretation of section 30212, the Access Guidelines would be invalid to the extent they authorized exactions for "passive and recreational uses" and "active recreational uses." (See fn. 7, *ante.*)

■ Although administrative mandamus is available in certain circumstances to challenge the validity of quasi-legislative action such as the adoption of guidelines, such a challenge can only be made if the issue is properly raised at the administrative hearing. (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 675-677 [170 Cal.Rptr. 484, 620 P.2d 1032]; *City of Walnut Creek* v. *County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1019 [162 Cal.Rptr. 224]; Cal. Administrative Mandamus (Cont.Ed.Bar 1966) p. 19.)

As stated in *City of Walnut Creek* v. *County of Contra Costa, supra,* 101 Cal.App.3d at page 1019: "In administrative mandamus actions brought under section 1094.5 of the Code of Civil Procedure, appellate review is limited to issues in the record at the administrative level. 'It is fundamental that the review of administrative proceedings provided by section 1094.5 of the Code of Civil Procedure is confined to the *issues* appearing in the record of that body as made out by the parties to the proceedings, though additional *evidence,* in a proper case, may be received.'" (Italics in original.) ■ No challenge was made to the guidelines at the administrative hearing. In addition, respondent cannot raise this issue in his section 1983 cause of action since that action is not concerned with violations of state law, such as a claim that an agency has acted in excess of its statutory authority. We therefore decline to rule on the validity of the Access Guidelines to which respondent now objects; for the purpose of our analysis we assume the Regional Commission was authorized by section 30212 to require exactions for "passive recreational use."

## II

Before turning to the question whether the specific condition imposed in this case is permissible under the federal constitution it is necessary to address certain arguments raised by the parties at oral argument concerning the proper standard for testing the general validity of all exactions. ■ Specifically, at oral argument respondent contended that a particular exaction is valid only if it (1) is related to needs to which the development

contributes, *and* (2) will directly or indirectly benefit the development. The Attorney General, on the other hand, while conceding that a particular exaction must be related to needs to which the development contributes, vigorously maintained there is no additional requirement that the exaction directly or indirectly benefit the development. As we explain, we agree with the Attorney General's characterization of the general rule and decide that the exaction in this case *is* related to needs created in part by this development.

The leading California case on the constitutionality of exactions is *Associated Home Builders etc., Inc.* v. *City of Walnut Creek* (1971) 4 Cal.3d 633 [94 Cal.Rptr. 630, 484 P.2d 606, 43 A.L.R.3d 847]. In *Associated Home Builders,* our Supreme Court upheld a statute which conferred upon cities and counties the power to require dedications of land or payment of fees in lieu thereof for park or recreational purposes as a condition of subdivision approval. The primary challenge to the statute was that it deprived a subdivider of property without just compensation. Associated Home Builders argued that such dedications or fee payments would be constitutional only if it could be shown that the need for the additional park and recreation facilities were uniquely attributable to the increase in population stimulated by the new subdivision alone. The Supreme Court rejected this argument, citing its earlier exaction decision in *Ayres* v. *City of Los Angeles* (1949) 34 Cal.2d 31 [207 P.2d 1, 11 A.L.R.2d 503]. In *Associated Home Builders,* the Supreme Court interpreted *Ayres* as allowing consideration of future needs and potential population growth in formulating the conditions imposed upon the subdivider. (*Associated Home Builders, supra,* 4 Cal.3d at pp. 637-639.) More importantly, the Supreme Court stated "[e]ven if it were not for the authority of *Ayres* we would have no doubt that [the statute in dispute] can be justified on the basis of a general public need for recreational facilities caused by present and future subdivisions." (*Id.,* at p. 638.) Thus, the Supreme Court held there need be only an indirect relationship between an exaction and a need to which the project contributes. (See also, *Remmenga* v. *California Coastal Com.* (1985) 163 Cal.App.3d 623, 628 [209 Cal.Rptr. 628]; Grable, *Legal Limits of Government Land Use Regulation—An Expanding Concept* (1974) 2 Pepperdine L.Rev. S27, S41; Note, *Taking Without Compensation Through Compulsory Dedication—New Horizons For California Land Use Law: Associated Home Builders* v. *City of Walnut Creek* (1972) 5 Loyola L.A. L.Rev. 218, 239-240.)

The plaintiff in *Associated Home Builders* also argued, as does respondent, that a subdivider may not be constitutionally compelled to dedicate land or pay a fee for park and recreational facilities unless his contribution necessarily and primarily benefits his particular subdivision. The *Associated Home Builders* court did *not* decide this issue; instead, the court stated

"[w]hether or not such a direct connection is required by constitutional considerations, [the park dedication statute] provides the nexus which concerns Associated." (4 Cal.3d at p. 640.) Nevertheless, dicta in the *Associated Home Builders* decision indicates such a benefit "nexus" is not required.[8] (Grable, 2 Pepperdine L.Rev., *supra,* at p. S41, fn. 62.)

To the extent the benefit "nexus" question was left open in *Associated Home Builders,* it was positively answered, at least in the beach access context, in *Sea Ranch Ass'n.* v. *California Coastal Com'n.* (N.D.Cal. 1981) 527 F.Supp. 390,[9] and *Georgia-Pacific Corp.* v. *California Coastal Com.,* *supra,* 132 Cal.App.3d 678. In both cases, the courts approved beach access dedication conditions without requiring that any benefit be conferred upon the conditioned developments.

*Sea Ranch* involved, inter alia, a challenge to the validity of public access conditions required for the approval of 32 residential construction permits in a large subdivision development on the Sonoma Coast. Specifically, the plaintiffs argued that the conditions constituted a taking of their property without just compensation. The court rejected this contention, relying primarily on *Associated Home Builders* and *Ayres.* The *Sea Ranch* court reasoned: "These cases indicate planning bodies may condition development on aesthetic considerations or dedications of property for public recreational facilities or access. *The fact that the development has no direct nexus to the condition, that the benefit to the public is greater than to the developer, or that future needs are taken into consideration, does not destroy the validity of the condition.* The court is free to look to these factors, as well as the general goals behind the authorizing statute, in evaluating the reasonable-

---

[8]This dicta is contained in a footnote: "Amicus curiae Sierra Club urges that the requirement of dedication or the payment of a fee may be justified under the state's police power even if the recreational facilities provided by the subdivider's contribution are not used for the specific benefit of the future residents of the subdivision but are employed for facilities used by the general public. Ordinarily if land within the subdivision is dedicated for a park it may be assumed that those who will reside in the subdivision will make primary use of the park. The problem of connecting the facilities with the use made of them by the subdivision residents arises when a fee in lieu of dedication is required. In view of the provisions of section 11546, we need not decide in the present case whether a subdivider may be compelled to make a contribution to a park which is, for example, not conveniently located to the subdivision. Parenthetically, however, we perceive merit in the position of amicus curiae. It is difficult to see why, in the light of the need for recreational facilities described above and the increasing mobility of our population, a subdivider's fee in lieu of dedication may not be used to purchase or develop land some distance from the subdivision but which would also be available for use by subdivision residents." (*Associated Home Builders, supra,* 4 Cal.3d at p. 640, fn. 6.)

[9]The *Sea Ranch* case was later vacated because the litigation was rendered moot by the enactment of Public Resources Code, section 30610.6, providing for a settlement of the dispute between the parties. (454 U.S. 1070 [70 L.Ed.2d 606, 102 S.Ct. 622].) Since the case was not vacated because of any infirmity in the court's reasoning, we believe it still has instructive, if not precedential, value.

ness of the regulation." (527 F.Supp. at p. 395, fn. omitted, italics added.) Applying this standard, the court found the access conditions valid because they were related to the need for access along the coast (*ibid.*); the court did not discuss the benefit (or lack thereof) to the development.

Similarly, in *Georgia-Pacific, supra,* 132 Cal.App.3d 678, the California Court of Appeal found certain lateral and vertical access conditions valid even though the conditions did not benefit the development. The *Georgia-Pacific* public access easements were required as a condition of expansion and improvement of a Georgia-Pacific industrial facility situated on the Mendocino coast. Again, the *Georgia-Pacific* court relied on *Associated Home Builders* in finding the conditions valid. By no stretch of the imagination did the conditions imposed in *Georgia-Pacific* "benefit" the proposed or existing development. The court apparently found it sufficient that the " 'scope and extent' of the easements required by the Commission were 'reasonably related' to one of the principal objectives of the Coastal Act, which is to provide for maximum access to the coast by all people of this State." (*Id.,* at p. 699.)[10]

In short, the cases which have applied *Ayres* and *Associated Home Builders* in the beach access context have not required that the access conditions benefit the proposed development. We believe this is a correct interpretation of *Ayres* and *Associated Home Builders,* and, in this regard, agree with the analysis in *Georgia-Pacific* and *Sea Ranch.* (See also, *Remmenga* v. *California Coastal Com., supra,* 163 Cal.App.3d 623.) Our reading of *Associated Home Builders* indicates there need be only an indirect relationship between a proposed exaction and a need to which the development contributes.[11] (*Georgia-Pacific Corp., supra,* 132 Cal.App.3d at p. 699.) The court can "consider the overall impact of a particular development and others like it, [and] the needs of the public, now and in the future . . . ." (*Sea Ranch Ass'n., supra,* 527 F.Supp. at p. 394.)

---

[10]Other easements in the case were found improper for reasons not pertinent to the present discussion. (*Id.,* at pp. 700-701.)

[11]We choose our words carefully here. Although a particular development need not create the need for a particular exaction, we believe *Associated Home Builders* does require that the exaction be designed to meet needs to which the project contributes, at least in an incidental manner. (See *Mid-Way Cabinet etc. Mfg.* v. *County of San Joaquin* (1967) 257 Cal.App.2d 181, 191 [65 Cal.Rptr. 37]; *Scrutton* v. *County of Sacramento* (1969) 275 Cal.App.2d 412, 421-422 [79 Cal.Rptr. 872]; see also, discussion, *post,* at p. 183.) Thus, an exaction for park or recreational purposes is valid because it is related to needs to which the subdivision contributes, since the subdivision decreases open space and increases population, thereby creating a need for open space and recreational facilities. By contrast, suppose a subdivision on the north coast were conditioned on dedication of land for a canal which comprises part of a state water project designed to transport water to Southern California. Assuming there were statutory authority for such an exaction, we do not believe it would meet the *Associated Home Builders* standard since the condition is not calculated to meet needs to which the project contributes.

The exaction under consideration here ·clearly meets this test. Respondent's beach front home is one more brick in the wall separating the People of California from the state's tidelands.[12] Although respondent's home alone has not created the need for access to the tidelands fronting his property, it is one small project among a myriad of others which together do severely limit public access to the tidelands and beaches of this state, and therefore collectively create a need for public access. (*Remmenga* v. *California Coastal Com., supra,* 163 Cal.App.3d at p. 630.) Thus, the condition exacted to facilitate access is related to a need to which respondent's project contributes, even though, standing alone, it has not created the need for access. (See *Associated Home Builders, supra,* 4 Cal.3d at pp. 638-640; *Scrutton* v. *County of Sacramento, supra,* 275 Cal.App.2d at pp. 421-422.) We therefore conclude that the particular condition imposed in this case meets the *Associated Home Builders/Ayres* standard as that standard has been interpreted and applied in the beach access cases.[13]

### III

We now examine the specific grounds underlying Judge Hall's conclusion that condition 3.d is unconstitutional. Judge Hall found that condition 3.d

---

[12]Since 1972, permission has been granted to construct more than 42,000 building units within the land jurisdiction of the Coastal Commission. In addition, pressure for development along the coast is expected to increase since approximately 85 percent of California's population lives within 30 miles of the coast. (Comment, *supra,* 28 UCLA L.Rev. 1049, 1050, fn. 10.)

As noted by our Supreme Court, "[i]n recent decades, the People of California have become painfully aware of the deterioration in the quality and availability of recreational opportunities along the California coastline due to the combined factors of an increasing demand for its use and the simultaneous decreasing supply of *accessible land* in the coastal zone." (*Pacific Legal Foundation* v. *California Coastal Com., supra,* 33 Cal.3d at p. 162, italics added.) The ballot argument in support of the California Coastal Initiative appealed to this "painful awareness" when it stated: " 'Our coast has been plundered by haphazard development and land speculation. Beaches formerly open for camping, swimming, fishing and picnicking are closed to the public.' " (*Id.,* at p. 162, fn. 1.)

The California Court of Appeal has also warned that development along the coast is creating a wall between the People of California and the tidelands: " 'The deleterious consequences of haphazard community growth in this state and the need to prevent further random development are evident to even the most casual observer.' [Citation.] This is particularly true of our 1,000-mile coastline. Visual, as well as physical, access to large segments of our beaches has been obstructed by residential, commercial and industrial development." (*CEEED* v. *California Coastal Zone Conservation Com.* (1974) 43 Cal.App.3d 306, 321 [118 Cal.Rptr. 315]; see also, Comment, *California Beach Access: The Mexican Law and the Public Trust* (1972) 2 Ecology L.Q. 571, 572-573; *Remmenga* v. *California Coastal Com., supra,* 163 Cal.App.3d at p. 630, and authorities cited therein.)

[13]We are aware of the view that the "nexus" requirement developed in *Associated Home Builders* and *Ayres* should not be applied to beach access exactions because such exercises of the police power involve a different governmental objective—discharge of the public trust duty to provide maximum public access to and along the shoreline—from that involved in the traditional park, street and sewer exactions. (Comment, *Public Beach Access Exactions: Extending the Public Trust Doctrine to Vindicate Public Rights* (1981) 28 UCLA L.Rev.

offended the federal constitution in three distinct ways. First, he found that condition 3.d violated substantive due process because it is not reasonably related to a legitimate governmental purpose. Second, he found that the condition constitutes a taking without compensation under the Fifth and Fourteenth Amendments. Finally, Judge Hall found that the condition violates the concept of "fundamental fairness" embodied in the Fifth and Fourteenth Amendments. We reject these findings and conclude that condition 3.d does not violate the federal Constitution.

## A. *Substantive Due Process*

■ Judge Hall's conclusion that condition 3.d violated substantive due process rested upon the finding that the condition was not reasonably related to a legitimate governmental purpose. The notion of "substantive" due process is normally associated with attacks on legislative exercises of the police power, that is, the enactment of statutes or adoption of legislation. (See, e.g., *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 368-369 [204 Cal.Rptr. 671, 683 P.2d 670]; *Hernandez* v. *Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77-78 [177 Cal.Rptr. 566, 634 P.2d 917]; *Perez* v. *City of San Bruno* (1980) 27 Cal.3d 875, 889 [168 Cal.Rptr. 114, 616 P.2d 1287]; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 409-410 [128 Cal.Rptr. 183, 546 P.2d 687].) ■ In this context, our Supreme Court has stated that "limited economic regulation of the use of real property imposed for the public welfare" does not violate substantive due process if the statute or regulation reasonably relates to a legitimate governmental purpose. (*Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392, 409-410; *Hernandez* v. *Department of Motor Vehicles, supra,* 30 Cal.3d at p. 78; see also, *American Bank & Trust Co.* v. *Community Hospital, supra,* 36 Cal.3d at pp. 369-370.) This is so because, "[i]n passing upon [a substantive due process challenge to a legislative police power measure], we exercise an extraordinary power over a coordinate branch of government and perform a correspondingly narrow function . . . ' "The doctrine . . . that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely . . . has long since been discarded . . . ." ' " (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735]; quoted in *Hernandez* v. *Dept. of Motor Vehicles, supra,* 30 Cal.3d at p. 78.) In sum, a legislative enactment affecting the economic use of land is valid under substantive due process if it reasonably relates to

1049, 1069-1086.) According to this theory, "the appropriate formulation of the police power in the context of beach exactions is that the exaction must be reasonably related to the state's discharge of its public trust responsibilities to ensure maximum public access to, and use of, the tidelands." (*Id.,* at p. 1079.)

a legitimate governmental purpose.[14] (See Kolis, *Citadels of Privilege: Exclusionary Land Use Regulations and the Presumption of Constitutional Validity* (1981) 8 Hastings Const. L.Q. 585, 590, fn. 13.)

■ ■■■ The substantive due process attack in this case, however, is not made on the statutes enacted by the Legislature or upon the guidelines adopted by the State Coastal Commission, but is directed instead against the Regional Commission's specific adjudicatory[15] act of imposing condition 3.d itself. ■ In short, the trial court found that condition 3.d itself, not the statutes or guidelines, violated substantive due process.

Although we have discovered no case which holds specifically that a substantive due process attack can be made on *adjudicatory* exercises of authority under a legislative enactment,[16] we may assume, without deciding, that such an attack may be made since, in any event, it is unavailing in this case.

---

[14]This is not to say that a state regulation or statute which reasonably relates to a legitimate governmental purpose therefore necessarily meets all constitutional requirements. A state regulation or statute affecting the use of land which passes muster under substantive due process may still be invalid as a taking under the Fifth Amendment as applied to the states through the Fourteenth Amendment. (See *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 129 [57 L.Ed.2d 631, 651-652, 98 S.Ct. 2646]; *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 325-326, 43 S.Ct. 158, 28 A.L.R. 1321]; Bowden and Feldman, *Take It or Leave It: Uncertain Regulatory Taking Standards and Remedies Threaten California's Open Space Planning* (1981) 15 U.C. Davis L.Rev. 371, 376-377; Stoebuck, *Police Power, Takings and Due Process* (1980) 37 Wash. & Lee L.Rev. 1057, 1057-1058.) The "taking" issue is treated separately from the substantive due process issue. See discussion, *post,* at pp. 29-41.

[15]In general, a governmental agency operates in an "adjudicatory" manner when " 'the government's action affecting an individual [is] determined by facts peculiar to the individual case' . . . ." (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 613 [156 Cal.Rptr. 718, 596 P.2d 1134], quoting *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 212 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973].) Adjudicatory actions are distinguished from " 'legislative' decisions which involve the adoption of a 'broad, generally applicable rule of conduct on the basis of general public policy.' " (*Ibid.*)

[16]In *Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. 104, the United States Supreme Court arguably assumes that such an attack can be made. In *Penn Central,* the owner of Grand Central Station in New York (Penn Central) challenged the city's decision not to allow it to build a large structure atop the station. The decision was made pursuant to a New York City law providing for the preservation of structures with special historic, architectural or cultural significance. The basic thrust of Penn Central's argument was that the restriction constituted a taking of its property without just compensation. The court noted in its analysis that "appellants do not contest that New York City's objective of preserving structures and areas with special historic, architectural, or cultural significance is an entirely permissible governmental goal. *They also do not dispute that the restrictions imposed on its parcel are appropriate means of securing the purposes of the New York City law.*" (*Id.,* at p. 129 [57 L.Ed.2d at p. 651], italics added.) The court therefore assumed that the specific restrictions imposed on Penn Central's property were reasonably related to a legitimate governmental purpose. (See Mandelker, *Land Use Takings: The Compensation Issue* (1981) 8 Hastings Const. L.Q. 491, 500.)

Respondent does not dispute that providing public access to the shoreline is a legitimate governmental purpose. (See *Gion* v. *City of Santa Cruz, supra,* 2 Cal.3d 29, 42-43; *Sea Ranch Ass'n.* v. *California Coastal Com'n., supra,* 527 F.Supp. at pp. 392-393.) Instead, the essence of respondent's substantive due process attack is that condition 3.d is not reasonably calculated to provide for public access since in his words, the "easement comes from nowhere and leads to nowhere [,and] [t]he subject parcel is bracketed on both sides by [] already existing beachfront homes [and private beaches]." However, respondent misapprehends condition 3.d's true purpose.

In imposing access conditions, the Coastal Commission is forced to proceed piecemeal on a permit-by-permit basis. (See Pub. Resources Code, §§ 30600, subd. (a), 30607, 30212, subd. (a); *Sea Ranch Ass'n.* v. *California Coastal Com'n., supra,* 527 F.Supp. at p. 393.) Thus, in order to facilitate access, the Coastal Commission must impose access conditions at the time a development permit is issued. If the Commission fails to provide for access at the time a permit is issued, it is effectively prohibited from obtaining an access condition at a later date unless the developer comes before the Commission for another permit. Given this regulatory scheme, we believe the condition imposed in this case is not only reasonably related to a legitimate governmental purpose, that is, providing access to the shoreline, but is also an intelligent compromise between the interests of the private property owner and the duty of the Regional Commission to ensure that access "*shall* be provided in new development projects . . . ." (Pub. Resources Code, § 30212, subd. (a).) It will be remembered that condition 3.d calls for an offer to dedicate an easement that will become effective *only* if accepted by a public agency or private association. In other words, according to the Commission's own Access Guidelines, there is no easement and respondent can exclude the public from the privately owned portion of his beach until such time as a public agency or private association agrees to accept the offer and the concomitant responsibility to police the beach. It would certainly be irrational for the Regional Commission to require an *actual* dedication of an easement that creates, in effect, a 10,000 square foot public beach bounded on three sides by private property. Nevertheless, the Regional Commission would be derelict in its duty under section 30212 if it did not at least provide the possibility of future public access where appropriate when approving "new development projects." By requiring an applicant to execute an irrevocable offer to dedicate an easement which will not likely be accepted unless and until the easement can feasibly be effectuated, the Regional Commission is recognizing the impracticality of creating 10,000 square foot state beaches, while at the same time providing the *potential* for lateral access should such access become practical at some time within 21 years after recording of the condition.

We therefore conclude that condition 3.d is reasonably related to a legitimate governmental purpose—that is, protecting the public's right of access to the tidelands—and therefore does not offend substantive due process.

B. *The Taking Issue*

 ██ Respondent next contends that condition 3.d effects a taking of his property for public use without just compensation within the meaning of the Fifth Amendment, which is of course made applicable to the states through the Fourteenth Amendment. (*Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. at p. 122 [57 L.Ed.2d at p. 647].)

Preliminarily, we think it important to note that California courts have in the past accorded great deference to government action designed to promote public rights in the tidelands, even where the action has resulted in serious economic harm to individuals. (Comment, *supra,* 28 UCLA L.Rev. at pp. 1081-1085.) ██ Where the state or its subdivisions have acted to promote the public trust[17] and such action has resulted in damage to the property rights of upland owners, the courts have generally been unwilling to find a taking, even though the action might be deemed a taking in a non-trust context. (*Id.,* at pp. 1081-1082; *Miramar Co.* v. *City of Santa Barbara* (1943) 23 Cal.2d 170 [143 P.2d 1]; *Henry Dalton & Sons Co.* v. *Oakland* (1914) 168 Cal. 463 [143 P. 721]; see also, *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408 [62 Cal.Rptr. 401, 432 P.2d 3].) For example, in *Henry Dalton & Sons Co.* v. *Oakland, supra,* 168 Cal. at p. 463, the City of Oakland intended to build a seawall. A company which owned property along the tidelands and landward of the proposed location of the seawall contended that construction of the wall would cut off its access to adjacent tidelands and the bay. The riparian landowner claimed it had a personal right of access to the deep waters of the bay over intervening tidelands, and that the city could not act to destroy

---

[17]The tidelands—which are those lands lying between the lines of mean high and low tide covered and uncovered successively by the ebb and flow thereof—are impressed with a public trust. (*Marks* v. *Whitney* (1971) 6 Cal.3d 251, 257-258 [98 Cal.Rptr. 790, 491 P.2d 374].)

The purpose and scope of the public trust "has evolved in tandem with the changing public perception of the values and uses of waterways." (*National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 434 [189 Cal.Rptr. 346, 658 P.2d 709].) Traditionally, the purpose of the public trust was to promote navigation, commerce and fisheries. (*Marks* v. *Whitney, supra,* 6 Cal.3d at p. 259.) However, "[t]he public uses to which the tidelands are subject are sufficiently flexible to encompass changing public needs. In administering the trust the state is not burdened with an outmoded classification favoring one mode of utilization over another." (*Ibid.*) Thus, more recently, the trust has been interpreted as conferring on the public the right to use the tidelands for "general recreation purposes" and to "fish, hunt, bathe, [and] swim." (*Ibid.;* see also, Comment, 2 Ecology L.Q., *supra,* at p. 583.)

its right of access (at least, presumably, without paying for the right). The Supreme Court rejected the riparian landowner's claim because "it had no right as an upland owner to the free and unobstructed access to navigable waters over [the] tidelands *as against the right of the state* to at any time devote them to the improvement of the harbor . . . in aid of the public easement of navigation and commerce . . . ." (*Id.*, at p. 468, italics added; see also, *People* v. *Southern Pac. R. R. Co.* (1913) 166 Cal. 627 [138 P. 103].)

Another example of the extreme deference accorded state action designed to further trust purposes can be found in *Miramar Co.* v. *City of Santa Barbara, supra,* 23 Cal.2d 170. In *Miramar,* the City of Santa Barbara built an ocean breakwater to create a harbor for fishing and pleasure boats. The breakwater blocked the littoral drift of sand along the coast. The plaintiff was an owner of beach property "down stream" from the breakwater. Since the breakwater blocked the flow of sand to the plaintiff's beach, the beach eventually eroded away and the plaintiff was deprived of its beach above the mean high tide line. The court denied recovery against the city for an unconstitutional taking, stating: "A littoral owner may have a right as against an individual to the uninterrupted flow of sand carried to his land by the ocean currents in their natural state . . ., but he has no such right as against the state. Littoral rights must give way to any use of the tide lands and water flowing over them *that serves the public [trust] right of navigation.*" (*Id.*, at p. 173, citations omitted, italics added.) In other words, the landowner in *Miramar* did not merely suffer a public easement, as in the present case, but the virtual loss of his entire beach. The government action that caused this result was nonetheless held to be constitutional.

The foregoing authorities do not, of course, stand for the proposition that a taking may *never* result when the state or its subdivisions is acting to promote trust purposes. These cases do, however, demonstrate that the courts have been extraordinarily deferential to state action designed to further the purposes of the public trust, even though such action results in significant economic injury to individuals. We remain mindful of this traditional deference as we undertake the analysis which follows.

■ In general, "[a] regulatory body may constitutionally require a dedication of property in the interests of the general welfare as a condition of permitting land development. It does not act in eminent domain when it does this . . . ." (*Georgia-Pacific Corp.* v. *California Coastal Com., supra,* 132 Cal.App.3d at p. 699, citing, inter alia, *Associated Home Builders etc., Inc.* v. *City of Walnut Creek, supra,* 4 Cal.3d at p. 633.)

As earlier noted, in *Associated Home Builders, supra,* 4 Cal.3d 633, our Supreme Court found it was constitutionally permissible to require dedica-

tion of subdivision property for park and recreational purposes as a condition of subdivision approval. In reviewing the decisions of sister states which had upheld similar dedication requirements, the Supreme Court observed that these decisions "reason that the subdivider realizes a profit from governmental approval of a subdivision since his land is rendered more valuable by the fact of subdivision, and in return for this benefit the city may require him to dedicate a portion of his land for park purposes whenever the influx of new residents will increase the need for park and recreational facilities." (*Id.*, at p. 644.)

Using the principles developed in *Associated Home Builders*, it has already been determined that, as a general proposition, the Coastal Commission may constitutionally require uncompensated access dedication as a condition of approving coastal development. (*Georgia-Pacific Corp.*, *supra*, 132 Cal.App.3d 698-699; *Sea Ranch Ass'n.* v. *California Coastal Com'n.*, *supra*, 527 F.Supp. 393-395.) ▮▮▮ Respondent has not challenged the Commission's *general* authority to require such access dedications. His complaint is instead addressed to the particular circumstances of this case. He claims the present case is distinguishable from the situation in which a large subdivider or industrial user of coastal land is required to dedicate a small portion of a large parcel to provide public access. (See, e.g., *Georgia-Pacific Corp.*, *supra*, 132 Cal.App.3d at pp. 684-687; *Sea Ranch Ass'n.* v. *California Coastal Com'n.*, *supra*, 527 F.Supp. at p. 390; *Sea Ranch Ass'n.* v. *California Coast. Zone Con. Com'n.* (N.D.Cal. 1975) 396 F.Supp. 533, 535.) Respondent emphasizes that he is merely the owner of a single lot on which he has built a single home for his own use. He further stresses that Judge Hall found the easement in question would affect 8,000 to 10,000 square feet of his lot, or nearly two-thirds of the total area, and the offer to dedicate the easement, if accepted, would essentially transform his private beach into a public beach. For these reasons, respondent claims the specific condition imposed constitutes a "taking" within the meaning of the Fifth Amendment.

Determining when government action amounts to a Fifth Amendment taking requiring the payment of compensation or invalidation of the action is not a simple undertaking that may proceed in well-defined fashion. The United States Supreme Court itself has candidly admitted it has never been able to develop a " 'set formula' " to determine when " 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons."[18] (*Penn Central*, *supra*, 438 U.S. at p. 124 [57 L.Ed.2d at

[18]For an exploration of the possible reasons for the elusiveness of the meaning of "taking" in our law, see Rose, *Mahon Reconstructed: Why the Takings Issue is Still a Muddle* (1984) 57 So.Cal.L.Rev. 561.

p. 648].) Instead, the high court has observed that "whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case.' " (*Ibid.*, quoting *United States* v. *Central Eureka Mining Co.* (1958) 357 U.S. 155, 168 [2 L.Ed.2d 1228, 1236-1237, 78 S.Ct. 1097].) The commentators for the most part agree that the United States Supreme Court has failed to provide any clear and adequate standard for determining when governmental action results in a "taking" under the Fifth Amendment. (See, e.g., Bowden and Feldman, *supra,* 15 U.C. Davis L.Rev. at pp. 371-372, 379-383; Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv.L.Rev. 1165, 1170; Sax, *Takings and the Police Power* (1964) 74 Yale L.J. 36, 37.)[19]

*Penn Central Transp. Co.* v. *New York City, supra,* remains the United States Supreme Court's clearest statement of "taking" law. Although admitting in *Penn Central* that taking analysis has proceeded on an essentially "ad hoc" basis, the Supreme Court did identify "several factors" that have particular significance in the analysis. First, is the "economic impact of the [action] on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." (438 U.S. at p. 124 [57 L.Ed.2d at p. 648].) Second, is the "character of the governmental action. A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (*Ibid.*) Third, and finally, "government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions have often been held to constitute 'takings.' " (*Id.,* at p. 128 [57 L.Ed.2d at p. 651].) This is in contrast to government action which improves "the public condition through resolution of conflict within the private. sector of the society . . . ." (Sax, *supra,* 74 Yale L.J. at p. 67.)[20]

For the reasons presently set forth, we do not believe the governmental action in this case amounts to a taking of respondent's property without compensation.

---

[19]In commenting on recent Supreme Court pronouncements regarding the "taking" issue, one article observes that: "Not since Justice Stewart announced his 'I know it when I see it' test of obscenity has the United States Supreme Court cast a major body of law into greater chaos than that now plaguing the law of police power land use controls." (Bowden and Feldman, *supra,* 15 U.C. Davis L.Rev. at p. 371.)

[20]The author of the quoted article suggests the third factor is the *only* one which should be used to distinguish "takings" requiring compensation from legitimate exercises of the police power. (Sax, *supra,* 74 Yale L.J. pp. 61-67.)

■ First, the California Supreme Court, in analyzing whether a zoning law goes "too far" (*Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. at p. 415 [67 L.Ed. at p. 322]) and thus constitutes a taking, has held that "a zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all reasonable use of his property." (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25], affd. *Agins* v. *Tiburon* (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138]; see also *Furey* v. *City of Sacramento* (1979) 24 Cal.3d 862, 872 [157 Cal.Rptr. 684, 598 P.2d 844].) Thus, in determining whether a *zoning law* amounts to a taking, our Supreme Court has concentrated exclusively on the first factor mentioned by the United States Supreme Court in *Penn Central:* the economic impact of the action on the claimant, and the extent to which it interferes with his distinct investment backed expectations. (438 U.S. at p. 124 [57 L.Ed.2d at p. 648].) The California Supreme Court determined that there can be no taking of property through regulation unless its effect is to deprive the landowner of substantially all reasonable use—and therefore all reasonable economic value—of his property. (*Furey* v. *City of Sacramento, supra,* 24 Cal.3d at p. 872; *Pescosolido* v. *Smith* (1983) 142 Cal.App.3d 964, 969 [191 Cal.Rptr. 415].) Although we recognize the *Agins* test was developed in a context different from that considered here—that is, the testing of a zoning law as opposed to a dedication as a condition of development—we believe the California Supreme Court's holding in *Agins* is nonetheless relevant since it evidences our Supreme Court's strong reliance on the "diminution in value" test in determining whether a taking has occurred.

■ Manifestly, condition 3.d has not robbed respondent of all reasonable use and economic value of his property. Respondent has built a home covering in excess of 5,000 square feet of his parcel. Although the trial court found that the condition decreased the value of the property by $150,000, this fact, even if true, does not mean respondent was deprived of all reasonable use of his property. Respondent purchased the property for $240,000 and his beach home was constructed for roughly $260,000, for a total investment of $500,000. While the litigation below was pending, a lis pendens was recorded giving notice that condition 3.d may eventually apply to the property. After the lis pendens was recorded, respondent obtained a loan for $540,000 which was secured only by a deed of trust on his Beach Drive property. Taking judicial notice of the fact that lenders do not lend for the full value of property securing the loan, we may surmise that even with condition 3.d imposed on the property, it had a value somewhere in excess of one-half million dollars. Even if the property would have been valued at $650,000 or more without condition 3.d, this is simply insufficient to establish that condition 3.d robbed respondent of "all reasonable use" of his property. (*Agins* v. *City of Tiburon, supra,* 24 Cal.3d at

p. 277; see *HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237] in which the Supreme Court found a diminution in the value of property from $400,000 to $75,000 did not amount to a taking of the property.)

Second, we do not believe it is dispositive of the taking issue in this case to classify condition 3.d as a physical invasion of respondent's property, which "may more readily be found" to be a taking. (*Penn Central, supra,* 438 U.S. at p. 124 [57 L.Ed.2d at p. 648].) If this were true, the subdivision dedications for park and recreation facilities required in *Associated Home Builders, supra,* 4 Cal.3d 633 and the traffic buffer strip required to be dedicated in *Ayres* v. *City of Los Angeles, supra,* 34 Cal.2d 31 would necessarily have involved takings under the Fifth Amendment. The forced dedications in those cases involved physical invasions greater than that involved in this case, and yet the Supreme Court found subdivision approval may constitutionally be conditioned on such dedication without the payment of compensation.

Finally, with respect to the factors outlined by the Supreme Court in *Penn Central,* it could be argued that imposition of condition 3.d is a "government action [] that may be characterized as [an acquisition] of resources to permit or facilitate uniquely public functions"—namely, the creation of a public beach. (*Penn Central, supra,* 438 U.S. at p. 128 [57 L.Ed.2d at p. 651].) However, even Professor Sax—who originated the theory that takings should be defined by a distinction between government action undertaken to acquire resources to facilitate uniquely public functions, as opposed to actions which involve a shifting of economic benefits and burdens to improve the public condition—admits an exception to this rule in a case such as that before us.

In his seminal article on the topic, Professor Sax notes the following exception to the rule he developed: "First, and simplest, of the exceptions is the group of reciprocal benefit cases. These are cases in which a restriction clearly enhances the resource value of a government enterprise, but where compensation is properly denied on the ground that the 'victims' received benefits which equal or exceed the detriment imposed. *Compulsory dedication laws often may be so analyzed.* While a developer may be required to dedicate some portion of his tract for roads, schools, or parks, the prospect and promise of urban facilities and services will often improve the value of the remaining portion of the tract sufficiently to more than offset the loss sustained in the dedication." (Sax, *supra,* 74 Yale L.J. at 73-74, italics added, fns. omitted.)

While respondent has not received the benefits that ordinarily accompany subdivision approval, such as the provision of public services, he has re-

ceived a substantial benefit by being allowed to proceed with the development of his property and to thereby greatly increase its value. The benefit involved is that the development is permitted on the coast—an extremely limited resource—in exchange for provisions to ensure maximum public access to, and use of, the tidelands. (Comment, *supra,* 28 UCLA L.Rev. at p. 1079.) As noted by our Supreme Court, the rationale of the subdivision exaction cases is that "the subdivider realizes a profit from governmental approval . . . since his land is rendered more valuable . . ., and in return for this benefit the [government] may require him to dedicate a portion of his land . . . ." (*Associated Home Builders, supra,* 4 Cal.3d at p. 644.)

Finally, although both the United States and California Supreme Courts have provided some guidelines to help determine when a taking has occurred, both courts acknowledge that takings analysis still proceeds to some degree on an "ad hoc" basis and turns on "the individual facts of each case." (*Penn Central Transp. Co.* v. *New York City, supra,* 438 U.S. at p. 124 [57 L.Ed.2d at p. 648]; *Agins* v. *City of Tiburon, supra,* 24 Cal.3d at p. 277.) At bottom, "[t]he root of a takings claim is that some public act has placed on an individual or group too high a proportion of some burden— a burden which all (or at least some larger portion of the community) should bear."[21] (Rose, *Planning and Dealing: Piecemeal Land Controls as a Problem of Local Legitimacy* (1983) 71 Cal. L.Rev. 839, 901-902, fn. omitted.)

Considering all of the circumstances, we do not believe it is unjust to require respondent alone to bear the burden of condition 3.d. Respondent has received a substantial benefit from the Regional Commission's decision to allow development of his property. In addition, when compared with the value of the developed property, the economic detriment is not so significant as to require a finding that a taking has occurred in this case.

In sum, we find the imposition of condition 3.d as a requirement of development did not amount to a taking of respondent's property within the meaning of the Fifth Amendment.

C. *"Fundamental Fairness."*

 At the conclusion of the trial on the section 1983 claim, Judge Hall, in addition to finding that condition 3.d contravened substantive due process

---

[21]See, e.g., *Agins* v. *City of Tiburon, supra,* 447 U.S. 255, 260 [65 L.Ed.2d 106, 111-112] ("The determination that governmental action constitutes a taking is, in essence, a determination that the public at large rather than a single owner, must bear the burden of an exercise of state power in the public interest."); *Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. at p. 416 [67 L.Ed. at p. 326] ("[T]he question at bottom is upon whom the loss of the changes desired should fall.").

and constituted a taking, also found that "the FIFTH and FOURTEENTH AMENDMENTS of the United States Constitution, express the principle of fundamental fairness in a constitutional sense and, as to both the FIFTH and FOURTEENTH AMENDMENTS, this fundamental principle of fairness has been violated by the actions of the [Regional Coastal Commission.]" Although Judge Hall did not cite any authority to support this conclusion (other than the amendments themselves), it is clear from respondent's brief and from closing arguments at the section 1983 trial that respondent is on this issue primarily relying on two pre-*Associated Home Builders* cases for support: *Mid-Way Cabinet etc. Mfg.* v. *County of San Joaquin, supra,* 257 Cal.App.2d 181, and *Scrutton* v. *County of Sacramento, supra,* 275 Cal.App.2d 412.

In *Mid-Way Cabinet, supra,* a furniture manufacturer (Mid-Way) sought a use permit to expand its facilities located at the intersection of two county roads, Eight Mile Road and West Lane. Prior to Mid-Way's application for a use permit, the county had planned to convert West Lane into an eight lane expressway and to build an interchange at the intersection of West Lane and Eight Mile Road. A condemnation proceeding was commenced against Mid-Way to acquire its access rights to the county roads. Two years later, before the condemnation proceeding was completed, Mid-Way sought the use permit to enlarge its operation. The county granted the use permit *conditioned* on Mid-Way dedicating its access rights without compensation, together with a strip of land for a roadway necessary to build the interchange. (257 Cal.App.2d 183-184.)

The Court of Appeal found that the condition constituted an unconstitutional taking of Mid-Way's property without compensation. (257 Cal.App.2d at p. 192.) Our reading of *Mid-Way Cabinet* indicates the court reached this conclusion for two reasons: First, the court believed a condition of dedication could not be required unless there was a "real relationship" between the condition demanded and the needs created by the project approved. (*Id.,* at p. 191; see, *Scrutton* v. *County of Sacramento, supra,* 275 Cal.App.2d at pp. 421-422.) The trial court had found sufficient evidence to establish that the expansion of Mid-Way's facilities would substantially increase vehicle traffic on the two roads, and that the conditions imposed would serve to ease the flow of the increased traffic. (257 Cal.App.2d at p. 184.) The appellate court disagreed with this conclusion and found there was absolutely no evidence that the expanded use of Mid-Way's facilities would result in increased traffic (*Id.,* at pp. 185, 191), and there was therefore no "real relationship between the thing wanted by the landowner from government and the quid pro quo exacted by government therefor." (*Id.,* at p. 192.)

Second, although not expressly identified as such by the court, we believe the existence of a pending condemnation proceeding against the property was also a factor in the court's decision to strike the condition. (See 257 Cal.App.2d at pp. 189, 191-192.) This was strong evidence that the permit process was a mere pretext and the condition a substitute for condemnation.

At the end of its analysis, almost as an afterthought, the *Mid-Way* court stated: "Various factors are taken into consideration by courts in determining whether in a given situation there is a proper exercise of the police power, in which case, as shown above, the landowner must yield 'uncompensated obedience' [citation], or whether a governmental exercise of the power of eminent domain is masquerading in the guise of the police power. The determining factor, as we have seen, is *fairness.*" (*Id.*, at p. 192, italics in original.) Respondent has latched onto this catch phrase—"the determining factor is *fairness*"—and, with the determination of a pit bull, refuses to let go.

We note first that the statement just quoted is merely one way of articulating what we previously recognized: that at bottom "[t]he root of a takings claim is that some public act has placed on an individual or group too high a proportion of some burden—a burden which all (or at least some larger portion of the community) should [in fairness] bear." (Rose, *supra,* 71 Cal. L.Rev. at pp. 901-902, fn. omitted.) Thus, we have already expressed our belief that the condition imposed in this case is, under the circumstances, "fair." (See discussion, *ante,* at pp. 171-178.)

Turning to the particular factors identified in Mid-Way as supporting the court's conclusion that the condition therein imposed was not "fair," we note first that no condemnation proceeding was pending in this case and we therefore do not have this factor lurking in the background as it was in *Mid-Way.* Moreover, we are not presented here, as was the court in *Mid-Way,* with a condition of dedication which bears no "real relationship" to the needs which a project creates or enhances. (See *Mid-Way Cabinet, supra,* 257 Cal.App.2d at p. 192; *Scrutton, supra,* 275 Cal.App.2d at pp. 421-422.) In this regard, it is important to distinguish between a requirement that a dedication bear a "real relationship" to the needs generated by a project and a requirement that a particular project *create* the need for the dedication. In *Associated Home Builders* our Supreme Court specifically held that a law requiring dedication of land for park and recreational purposes as a condition of subdivision approval was valid even though it could not be shown "that the particular subdivider upon whom an exaction has been imposed will, solely by the development of his subdivision, increase the need for recreational facilities to such an extent that additional land for such facilities will be required." (4 Cal.3d at p. 640.) Another division of

this court later relied on *Associated Home Builders* to support its holding that the validity of a coastal access condition "is not dependent on a factual showing that [a particular] development has created the need for it." (*Georgia-Pacific Corp.* v. *California Coastal Com., supra,* 132 Cal.App.3d at p. 699.)

Although, as previously discussed, we do not read *Associated Home Builders* as indicating there need be no relationship between needs created or enhanced by the project approved and the condition exacted, we have already explained that the requisite relationship clearly exists in this case.

*Scrutton* v. *County of Sacramento, supra,* adds nothing to the analysis in *Mid-Way Cabinet* other than to point out that the court in *Mid-Way* essentially based its decision on a finding that the proposed project did not contribute to the need for the conditions imposed. (275 Cal.App.2d at pp. 421-422.)

We therefore find *Mid-Way Cabinet* and *Scrutton* not controlling, and that condition 3.d is fair.

We conclude condition 3.d does not violate the federal Constitution and that the judgment for damages and attorney's fees under sections 1983 and 1988 of Title 42, United States Code, must therefore be reversed. Since we have decided appellants are not liable under section 1983 because there was no federal constitutional violation, we do not address appellants' additional contention that they are not amenable to suit under that section in any event.

IV

Having concluded that condition 3.d does not violate the federal Constitution, we must still decide whether the Regional Commission abused its discretion within the meaning of section 1094.5, subdivision (b) of the Code of Civil Procedure. This section provides: "[a]buse of discretion is established if the [administrative agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." An abuse of discretion may of course be established without showing that a constitutional violation has occurred. (See, e.g., *Gabric* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App.3d 183, 188-189, 192 [140 Cal.Rptr. 619].) In determining whether an administrative agency has proceeded in the manner required by law "[m]ost frequently . . . the issue turns on an interpretation of the statute governing the particular activity." (Cal. Administrative Mandamus (Cont.Ed.Bar) § 5.13, p. 42.)

Judge May, who tried only the administrative mandamus cause of action, found that the Regional Commission abused its discretion when it imposed condition 3.d because the condition "could not reasonably carry out the purpose for which the Coastal Commission was created." Judge May seemed particularly troubled because none of the other private parcels along the beach were burdened by a condition similar to condition 3.d, and it was unlikely that such conditions could be imposed on those parcels in the future. (See the portion of the trial court's opinion set forth, *ante,* at fn. 3.) Thus, the Coastal Commission could not expect "with any reasonable degree of certainty" to acquire an easement over all, or at least a substantial portion, of the private beach fronting the Beach Drive enclave.

Judge May's opinion could be construed as a finding that condition 3.d violated substantive due process because it is not reasonably related to a legitimate governmental objective. We have already rejected this rationale for invalidating condition 3.d, and to the extent Judge May's decision is grounded on substantive due process it is likewise rejected.

However, Judge May's decision can also be interpreted in another fashion; namely, as indicating that the Regional Commission abused its discretion because the decision was not supported by the findings. That is, Judge May apparently believed the condition would be valid only if the Regional Commission specifically found similar conditions had already been imposed on many of the adjacent parcels; or, there was "a reasonable degree of certainty" that such conditions could be imposed in the future; or, presumably, that there was some other likely method—such as outright condemnation and acquisition—for obtaining access through the rest of the private parcels on the beach. (See fn. 3, *ante.*) In short, we believe Judge May's order indicates his belief that the Regional Commission was required to make a specific finding that there was a reasonable possibility acceptance of the offer to dedicate the easement would be feasible within the period of the condition, and this finding in turn had to be supported by substantial evidence, before the Regional Commission could properly impose the condition. (See Code Civ. Proc., § 1094.5, subd. (b); *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514-515 [113 Cal.Rptr. 836, 522 P.2d 12].)

In *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* our Supreme Court explained in detail the reason for the "findings requirement" in quasi-judicial administrative decision making: "[I]mplicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order. . . . [¶] . . . Among other functions, a findings requirement serves to conduce the administrative body

to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. (See 2 Cooper, State Administrative Law (1965) pp. 467-468; Feller, *Prospectus for the Further Study of Federal Administrative Law* (1938) 47 Yale L.J. 647, 666. Cf. Comment, *Judicial Control Over Zoning Boards of Appeal: Suggestions for Reform* (1965) 12 U.C.L.A. L.Rev. 937, 952.) In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. (See *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 274 . . .; *Swars* v. *Council of City of Vallejo* (1949) 33 Cal.2d 867, 871 . . . .) [¶] Absent such roadsigns, a reviewing court would be forced into unguided and resource-consuming explorations; it would have to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency. Moreover, properly constituted findings enable the parties to the agency proceeding to determine whether and on what basis they should seek review. (See *In re Sturm* (1974) *ante,* [11 Cal.3d] pp. 258, 267 . . .; *Swars* v. *Council of City of Vallejo, supra,* at p. 871.) They also serve a public relations function by helping to persuade the parties that administrative decision-making is careful, reasoned, and equitable." (*Id.,* at pp. 515-517, fns. omitted.)

Although the Regional Commission did not find that the remainder of the private beach fronting Beach Drive was likely to be opened to public use in the future and that the aim of condition 3.d was therefore attainable, it did find that, although vertical public access existed at public beaches north and south of the enclave, "[p]ublic access is not available along this portion of Beach Drive. . . . This area of Beach Drive is a private enclave which restricts both vehicular and pedestrian access. No physical barrier exists between this section of private and public beach. The project, as conditioned, provides a lateral access strip to facilitate public access along the shoreline. As conditioned, the project is consistent with Section 30210 of the Coastal Act which requires public access to and along the shoreline be maximized."[22]

This finding is clearly supported by substantial evidence presented at the hearing on respondent's application for a development permit, and, we believe, is also sufficient to support the Regional Commission's decision to impose condition 3.d. (*Topanga, supra,* 11 Cal.3d at pp. 514-515; *Zakes-*

---

[22]The resolution granting the permit was made "subject to the Commission's findings and conditions of approval, if any, as cited in the . . . staff report . . . ." Thus, the Commission adopted the recommended findings contained in the staff report, which included the finding just quoted.

*sian* v. *City of Sausalito* (1972) 28 Cal.App.3d 794, 798 [105 Cal.Rptr. 105].)

As previously noted, section 30212, subdivision (a), of the Public Resources Code provides that public access *"along* the coast *shall* be provided in new development projects" (italics added) unless three narrow exceptions apply. This section constitutes a statutory directive that access shall be provided in connection with new development projects unless the Coastal Commission finds that one of the exceptions mentioned in the statute applies. In light of the statutory directive in favor of access (Pub. Resources Code, § 30212, subd. (a); see also § 30210), the only finding which must be made in order to justify a decision to provide access (other than the finding that the activity in question is a "new development project" within the meaning of section 30212, which is not here disputed)[23] is that the proposed exaction or condition in question is reasonably related to ensuring "maximum public access" to or along the tidelands in question.[24] This requirement was satisfied by the findings quoted above, which sufficiently "bridge[d] the analytic gap between the raw evidence and ultimate decision or order," (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 515); ensured that the Commission's decision was the product of "orderly analysis"; and "enable[s] the reviewing court to trace and examine the agency's mode of analysis." (*Id.,* at p. 516; see also, *L & M Professional Consultants, Inc.* v. *Ferreira* (1983) 146 Cal.App.3d 1038, 1056 [194 Cal.Rptr. 695], *Bakman* v. *Department of Transportation* (1979) 99 Cal.App.3d 665, 688 [160 Cal.Rptr. 583]; *Natural Resources Defense Council, Inc.* v. *California Coastal Zone Conservation Com.* (1976) 57 Cal.App.3d 76, 88-90 [129 Cal.Rptr. 57]; *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 596 [122 Cal.Rptr. 100].)

Nothing in the law authorizing dedication of beach access suggests that the Regional Commission must make specific findings that a public easement contemplated by an access condition will necessarily become practicable within the period of the condition, as the trial court seemed to think nec-

---

[23]The Commission's failure to make a finding on this issue, which is not here challenged, was not the basis of the trial court's decision. Moreover, the fact that the construction of respondent's home constitutes a "new development project" is indisputable. It would therefore be pointless for us to remand this case for an administrative finding on this obvious and uncontested peripheral issue.

[24]In order to justify a decision *not* to condition a new development permit on the provision of public access the Commission must find that "(1) [such access] is inconsistent with public safety, military security needs, or the protection of fragile coastal resources, [or] (2) adequate access exists nearby, or (3) agriculture would be adversely affected." (Pub. Resources Code, § 30212.)

essary.[25] On the contrary, the requirement of such a showing would frustrate the obvious purpose of section 30212. As we earlier observed, the Regional Commission possesses the authority to impose access conditions only reactively on a case-by-case basis when a development permit is sought; it may not act unilaterally nor on a comprehensive area-wide basis. (See discussion, *ante,* at p. 170.) Ordinarily, it is therefore true that, as in this case, the Commission cannot know with certainty whether future events will occur that as a practical matter are essential to implementation of the provisions of an access condition earlier imposed. Thus, if the validity of the earlier condition is deemed to depend on the certainty that its purposes can feasibly be attained, the Commission would be unable to condition new development permits so as to create the possibility of future access in a broad range of situations similar to that before us. This theory would therefore materially impair use of the permit process as a device to achieve maximum public access along the coast of this state. This result is clearly inimical to the legislative purpose and we decline to reach it for that reason.

Before leaving the subject, we think it appropriate to point out that there is an inverse relationship between the unlikelihood of the future occurrences essential to achieve the purposes of a condition such as that here imposed and the burden of that condition on the landowner whose property is encumbered; i.e., the greater the unlikelihood the lesser the burden. Therefore, if it is true that there is little or no likelihood of the future events necessary to implement the instant condition, the burden of that condition on respondent is correspondingly attenuated. If the events do not occur within the prescribed 21-year period, the condition will simply expire.

---

[25]A portion of *Georgia-Pacific Corp.* v. *California Coastal Com., supra,* 132 Cal.App.3d 678, might be read as supporting the trial court's view. We find, however, that *Georgia-Pacific* is distinguishable in this regard.

In *Georgia-Pacific* the Coastal Commission required that a " 'conditional lateral access easement' " be dedicated as a condition of Georgia-Pacific's expansion and improvement of industrial facilities situated on the Northern California Coast. The "conditional lateral access easement" was situated on industrial land and was not to be opened to the public until Georgia-Pacific discontinued or altered the use of the land so as to make use of the easement " 'consistent with public safety.' " (*Id.,* at p. 687, fn. 4.) The decision to require this conditional easement was based on an *express finding* that Georgia-Pacific " '*might* at some future time change its use of the land . . . or *perhaps* vacat[e] the site entirely.' " (*Id.,* at p. 700, italics in original.) However, the trial court found—and the Court of Appeal agreed—that there was no evidence to support the finding relied on by the Commission in imposing the "conditional lateral access easement." Thus, the procedural defect was that there was no substantial evidence to support a finding *which the Commission relied on* in imposing the condition.

By contrast, in the present case, our inquiry is not directed towards discovering whether substantial evidence existed to support a finding on which the Regional Commission actually relied in imposing condition 3.d, but whether a specific finding was necessary to justify the decision in the first instance. Since we have concluded that such an express finding was not required and was not made or relied on in this case, we do not examine whether such a finding would have been supported by substantial evidence. In addition, we decline to follow *Georgia-Pacific* to the extent it can be read to indicate that such a finding is required.

To be sure, respondent will during the life of the condition inevitably remain prejudiced by the possibility that the necessary events, no matter how unlikely, may nonetheless occur. However, in light of the strong provision for public access set forth in article X, section 4, of our Constitution, in light of the direction therein to the Legislature to "enact such laws as will give the most liberal construction to this provision," and in light of the manifest intention of the Legislature to do just that by enactment of the public access provisions of the Coastal Act (§§ 30210-30214), the prejudice to respondent from the possibility of public access to his property is as a matter of law more tolerable than the alternative prejudice to the public that would result from foreclosing that possibility.

For the foregoing reasons, we conclude that the Regional Commission's decision to impose condition 3.d was amply supported by the findings, that the relevant findings were supported by substantial evidence, and that the Regional Commission did not otherwise abuse its discretion within the meaning of Code of Civil Procedure section 1094.5. Therefore, the judgment in favor of respondent on the cause of action for administrative mandamus must also be reversed.

## DISPOSITION

The judgments in favor of respondent on the first and second causes of action and the order awarding attorney's fees are reversed, and the trial court is ordered to enter judgment in favor of appellants.

Rouse, J., and Smith, J., concurred.

A petition for a rehearing was denied April 23, 1985.