[No. B084720. Second Dist., Div. Three. Feb. 27, 1996.]

AMERI-MEDICAL CORPORATION et al., Petitioners, v. WORKERS' COMPENSATION APPEALS BOARD, CALIFORNIA RANCHWEAR, INC., et al., Respondents.

[No. B081772. Second Dist., Div. Three. Feb. 27, 1996.]

AMERI-MEDICAL CORPORATION, Petitioner, v. WORKERS' COMPENSATION APPEALS BOARD and SANTA ANA UNIFIED SCHOOL DISTRICT, Respondents.

COUNSEL

Michael Goch and Gail Sanes for Petitioners.

Cadwalader, Wickersham & Taft, John C. Kirkland, Valensi, Rose & Magaram, Kenneth L. Heisz, Jones, Day, Reavis & Pogue, Elwood G. Lui, Christine Samsel, Davis Wright Tremaine and Michael John Tichon as Amici Curiae on behalf of Petitioners.

Kennith L. Peterson, Maureen A. Hatchell Levine, Robin G. Eifler, Kegel, Tobin & Truce and D'Arcy T. Swartz for Respondents.

Horvitz & Levy, Christina J. Imre, Gary Gleb, Richard A. Krimen, Charles W. Savage, Perry O. Johnson and Ernest A. Canning as Amici Curiae on behalf of Respondents.

## OPINION

**KITCHING, J.**—In this workers' compensation proceeding, we granted petitioner Ameri-Medical Corporation's (Ameri-Med or the medical clinic)[1] petitions for writs of review, and consolidated these two cases for hearing and decision because they involve the question of the application and constitutionality of Labor Code section 4628, subdivision (d).[2]

Subdivision (d) of section 4628 provides that "[n]o amount may be charged in excess of the direct charges for the physician's professional

---

[1] Ameri-Med is a professional medical corporation that engages physicians to examine injured employees and generates medical-legal reports used to support employees' workers' compensation claims.

[2] Unless otherwise specified, all further statutory references are to the Labor Code.

services and the reasonable costs of laboratory examinations, diagnostic studies, and other medical tests, and reasonable costs of clerical expense necessary to producing the report. Direct charges for the physician's professional services shall include reasonable overhead expense."

We hold that the purpose of section 4628 must govern the interpretation of subdivision (d). The Legislature enacted section 4628, an anti-ghostwriting statute, to ensure the reliability of the medical evaluation by controlling the quality of the medical-legal report. The statute enumerates the responsibilities of the physician signing the report. Subdivision (d) does not operate to limit or regulate the amount of legitimate fees a physician or medical clinic can charge to prepare a medical-legal report. It does not address the issue of profit; other statutes do. Subdivision (d) merely furthers the anti-ghost-writing purpose by listing the permissible charges, all related to and limited to the physician's responsibilities, that are reimbursable as fees and costs for the preparation of the report. As such, the statute does not contain the constitutional infirmities of which Ameri-Med complains.

We further hold that respondents Transamerica Insurance Group (Transamerica) and Santa Ana Unified School District, when asserting a violation of section 4628, subdivision (d) as an objection to payment of a lien/bill, have a legitimate interest in identifying impermissible charges in the billings, but they do not have a right to unfettered access to Ameri-Med's business records. Respondents may only seek discovery of relevant and unprivileged information that will assist them in determining the medical services performed by the signing physician, the amount of direct charges for the physician's professional services, and the amount of costs for related medical tests, clerical expenses, and overhead. (§ 4628, subds. (a), (d).)

In both cases, Ameri-Med, as the lien claimant, sought payment for a medical evaluation and report. The employer/carrier invoked the medical clinic's alleged violation of section 4628, subdivision (d), as an objection to payment. It questioned Ameri-Med's bills and the time and value of the medical services provided, and propounded discovery to ascertain the financial relationship between the medical clinic and the physicians who examined the applicants and prepared the reports. The Workers' Compensation Appeals Board (Board) ordered Ameri-Med to comply with the discovery requests, and it refused.

Ameri-Med challenges the Board's orders on grounds that (1) section 4628, subdivision (d), as applied, is an unconstitutional fee regulation statute that deprives the medical clinic of the ability to make any profit, and (2) the

discovery requests constitute an impermissible invasion of the right to privacy in financial information.

Our examination of the issues is limited. We only evaluate section 4628, subdivision (d) in light of constitutional standards and determine permissible areas of discovery under the statute. " 'Analysis of the problems which may arise respecting the interpretation or application of particular provisions of the [statute] should be deferred for future cases in which those provisions are more directly challenged.' [Citations.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281].)

Additionally, we do not decide what specific costs may be included or considered as "direct physician charges," or "overhead expenses" or considered as "reasonable" under section 4628, subdivision (d). Under the procedural posture of our case, (1) the issue as to inclusion or rejection of specific fees and costs from the lien/bill is not properly before this court, and (2) a determination as to the meaning of those terms is not required to ascertain the constitutionality of subdivision (d). The Board has the discretion to determine whether fees are reasonable, to decide what factors constitute direct physician charges and overhead expenses, and to promulgate necessary rules and procedures. (§§ 133, 5307, 5307.4; *Gould* v. *Workers' Comp. Appeals Bd.* (1992) 4 Cal.App.4th 1059, 1073 [6 Cal.Rptr.2d 228] (conc. opn. of Epstein, J.); *Crawford* v. *Workers' Comp. Appeals Bd.* (1989) 213 Cal.App.3d 156, 168 [259 Cal.Rptr. 414].) These matters are appropriately addressed to the Board.

Accordingly, we annul the December 27, 1993 and February 18, 1994 orders of the Board and remand the matter of respondents' entitlement to discovery to the Board for further proceedings.[3]

---

[3]On July 6, 1994, Transamerica, California Ranchwear, Inc.'s workers' compensation insurance carrier, advised this court it was withdrawing the subpoena duces tecum for financial records and a motion to compel further answers and financial documents for the depositions of Ameri-Med physicians, Drs. Kreman and Franco. Transamerica also withdrew its reliance on section 4628, subdivision (d) as a bar to Ameri-Med's recovery on its lien. The carrier then asserted Ameri-Med's petition was moot, and it would not file a response. Transamerica failed to file any response even after being served this court's subsequent "Order and Writ of Review," which gave the carrier an opportunity to reply. While the petition as to Transamerica is moot, the case poses issues of significant importance in the post-reform workers' compensation community, and it is appropriate that they be resolved. (*Davis* v. *Superior Court* (1985) 169 Cal.App.3d 1054, 1058, fn. 3 [215 Cal.Rptr. 721]; *Montalvo* v. *Madera Unified Sch. Dist. Bd. of Education* (1971) 21 Cal.App.3d 323, 329 [98 Cal.Rptr. 593].)

## FACTUAL AND PROCEDURAL BACKGROUND

*Ursula Lizzi Case*[4]

Applicant Ursula Lizzi (Lizzi) was employed from April 1981 to March 28, 1990, as a bookkeeper by defendant California Ranchwear, Inc. (Ranchwear), insured by defendant Transamerica.[5] She was terminated after a dispute over her vacation plans. On May 7, 1990, Lizzi filed an employee's claim alleging an industrial injury to her psyche due to stress.

Subsequently, Lizzi sought a psychological examination and evaluation for medical-legal purposes at the Eleventh Street Clinic, owned by Ameri-Med.[6] Psychiatrist Napoleon Franco, M.D. (Franco) and clinical psychologist Marilyn Kreman, Ph.D. (Kreman) conducted an initial pyschodiagnostic evaluation and a series of follow-up evaluations of Lizzi's condition.

On or about November 16, 1990, Ameri-Med submitted a medical bill and lien to the employer/carrier, defendant Transamerica, for $7,785 for medical-legal services incurred by Lizzi.[7] In a letter dated December 18, 1990, Transamerica objected to the lien/billing on the grounds "[t]he above-captioned lien is for self-procured medical treatment. Pursuant to LC [§§]

---

[4]Ameri-Medical Corp. v. Workers' Compensation Appeals Board, WCAB No. LBO 218124.

[5]Defendant's employer, Ranchwear, and carrier, Transamerica, will be referred to as "Transamerica."

[6]"Medical-legal expenses in workers' compensation proceedings are litigation expenses authorized in the Labor Code. . . . Labor Code section 4620 define[s] 'medical-legal' expenses as 'any costs and expenses incurred by or on behalf of any party, the administrative director, the board, or a referee for X-rays, laboratory fees, other diagnostic tests, medical reports, medical records, medical testimony, and, as needed, interpreter's fees, for the purpose of proving or disproving a contested claim.' [¶] When such expenses are incurred by an applicant, their purpose is to assist him or her in proving an industrial claim. Such expenses are generally payable by the employer/carrier whether the claim is proved or not, although the Board has ruled where the employee has given a false medical history to examining physicians, the employee is not entitled to reimbursement for the cost of medical reports or depositions. (*Penny* v. *Workers' Comp. Appeals Bd.* (1983) 48 Cal.Comp.Cases 468.)" (*American Psychometric Consultants, Inc.* v. *Workers' Comp. Appeals. Bd.* (1995) 36 Cal.App.4th 1626, 1631, fn. 1 [43 Cal.Rptr.2d 254].)

[7]The bill listed charges for psychological testing and each therapy session, and included a $1,400 charge for two initial psychiatric evaluations described as: "Comprehensive examination including complete medical and surgical history, physical exam, interpretation of appropriate x-ray and lab results, determination of treatment program when indicated & preparation of comprehensive report."

4600 and 4903, the issue of whether said treatment is reasonable and/or necessary is in dispute, and said lien is objected to, pending resolution at the time of hearing." On June 4, 1992, Transamerica and Lizzi settled the claim of injury by a compromise and release for $8,500 and a *Thomas* waiver, but left open the issue of the unpaid lien claim.[8] A hearing was set for July 14, 1992.

On June 23, 1992, Transamerica served on Ameri-Med a subpoena duces tecum (subpoena) for documents relating to Lizzi's treatment and condition, and the financial arrangement between the medical clinic and Drs. Franco and Kreman. As to the latter, the subpoena specifically requested: "Any and all records, ledgers, account books, payroll records, receipts, cancelled checks, check stubs, invoices, statements, timesheets, time reports, tax I.D. number(s), W-2 form(s), 1099 form(s), reports, writings, correspondence, notes, memoranda, and any other documents, whether on paper, film, or any type of magnetic media—including but not limited to recording tape, compact disc, floppy disc, data tape, or optical disc—reflecting payment(s) made by Lien Claimant, for services rendered to applicant herein, to Doctor(s) NAPOLEON FRANCO, M.D., MARILYN KREMAN, PH.D., LICENSED CLINICAL PSYCHOLOGIST." After a hearing on July 14, 1992, the workers' compensation judge (WCJ) ordered Ameri-Med to comply with the subpoena or have its lien dismissed. Ameri-Med agreed to produce all requested information, except the financial arrangements with Franco and Kreman on the ground that section 4628, subdivision (d), on which the subpoena was based, was unconstitutional.

Transamerica then filed a motion for full compliance with the subpoena and contended the financial records were relevant to determine whether Ameri-Med violated the provisions of section 4628, subdivision (d), which permitted inquiry to test the accuracy and detail of the lien. The employer/carrier further contended discovery was necessary to determine if Drs. Franco and Kreman were independent contractors and if Ameri-Med charged respondents an amount in excess of the physicians' direct charges. Transamerica challenged not only the reasonable nature of Ameri-Med's charges, but also whether they were necessary and actually incurred. In opposition, Ameri-Med argued section 4628, subdivision (d), was unenforceable as a fee-regulating statute because it was constitutionally infirm and violated the right to financial privacy. Ameri-Med attached the declarations of Drs. Franco and Kreman that described their financial arrangement with the

---

[8] *Thomas* v. *Sports Chalet, Inc.* (1977) 42 Cal.Comp.Cases 625.

medical clinic.[9] On January 21, 1993, the presiding workers' compensation judge (PWCJ) quashed the subpoena as "overly broad."[10]

On February 24, 1993, Transamerica deposed Franco and Kreman, who refused either to provide a copy of their employment contracts or to respond to a series of questions regarding salary, employment agreements with Ameri-Med, malpractice and health insurance carriers, income tax payments, and receipt of 1099 forms. Transamerica then filed a motion to compel further deposition answers, which Ameri-Med opposed. On March 23, 1993, the WCJ denied Transamerica's motions to compel deposition answers and produce the employment contracts.

On or about April 8, 1993, Transamerica filed a petition for removal of the case to the Board on grounds that the financial information and employment contracts requested in the subpoena and at the physicians' depositions were relevant to the issue of whether Ameri-Med violated section 4628, subdivision (d) by charging the employer/carrier costs in addition to the charges of its "independent contractor" physicians. The only way to determine if the lien claimant was involved in this practice, Transamerica contended, was to permit discovery of the financial arrangements between the medical clinic that bills for physician services and the physicians who actually rendered the services. In opposition, Ameri-Med again argued the right to privacy and the constitutional infirmity of the statute. The WCJ recommended denial of the

---

[9]In his declaration, Franco stated, in relevant part: "3. Throughout my association with Amerimed Medical Corporation I was not paid on a 'per-patient', 'per-evaluation', 'per-report' or 'per-visit' basis with any patient. I was paid a specified amount of money, twice per month, based upon my agreement to appear at the facilities of Amerimed Medical Corporation and to examine, treat and/or evaluate patients between agreed-upon hours during that time period. Further, I was provided certain benefits, paid time off and sick days. There was no 'average' number of patients which I saw on any given day. Further, there was no 'average time' which I expended in examination, evaluation or treatment of any patient. The amount of time expended with each patient depended upon the complexity of the case and the purpose for which I was seeing him or her. The number of patients I saw on any particular day depended upon the number of patients for which I was scheduled. I was paid the same amount of money, twice per month, regardless of the number of patients I saw and without regard to whether or not Amerimed Medical Corporation was paid for my services with respect to those patients."

Kreman's declaration contained the identical paragraph.

[10]The January 21, 1993 order of the PWCJ read, in relevant part: "IT IS HEREBY ORDERED That the Subpoena issued by Defendant in this matter on June 23, 1992 was ordered quashed based upon the Code of Civil Procedure 2023 (a). This Subpoena is found to be overly broad and is further employing a discovery method in a manner or to an extent that cause unwarranted annoyance, embarrassment, or oppression, or undue burden and expense."

petition on the grounds that the discovery requests constituted harassment on the part of Transamerica, and because the charges were not in excess of those allowed under section 4624 and therefore were presumed reasonable. On February 18, 1994, the Board, agreeing with the employer/carrier, granted Transamerica's petition and also rescinded the WCJ's orders quashing Transamerica's subpoena and denying its motions to compel and produce.[11]

Ameri-Med sought relief in this court by filing a petition for writ of mandate/prohibition.[12]

---

[11]The Board stated, in relevant part: "Defendant contends and the Board agrees that the questions and documents raised by the defendant are necessary to determine lien claimant's compliance with Labor Code section 4628(d). As indicated by defendant, the 'purpose of the inquiry is to determine independent contractor status. In the case where medical groups employ physicians as employees of the medical group, the charges of the medical group are the direct charges of the physician. The practice which the Legislature sought to outlaw (by Lab. Code, § 4628) is the situation where a medical group employs an independent contractor to provide a medical-legal service, and then charge[s] a fee over and above the independent contractor's fees. . . . The purpose of the subpoenas in this case is not to harass the examining doctors. . . . The issue of whether there is a violation of Labor Code section 4628 goes to the core of whether this case is compensable . . . , whether any of these medical reports can be offered in evidence on the issue of injury, . . . and therefore whether the lien claimants (can) prove injury in order to recover any treatment costs under Labor Code 4600.' [¶] The Board agrees that the defendant in this matter is entitled to explore the employment relationship between reporting physicians and the corporate lien claimant as well as to explore how the physicians were paid in connection with specific services and administrative overhead charges and costs added to the direct charges of the physicians. . . . As such it would seem that the only information not relevant would be request for tax information that does not relate solely to the doctors named in the subpoena. [¶] Therefore, the Board will grant removal in order to rescind the WCJ's orders and to issue orders allowing discovery requested, but with a limitation that the discovery be limited to the relationship between these physicians and the corporation."

[12]Since Transamerica's decision to withdraw its subpoena and motions to compel and produce effectively waived its right to proceed with discovery, we consider the Board's February 18, 1994, ruling on the discovery issue to be final, and construe Ameri-Med's petition as a petition for writ of review. (Cal. Workers' Compensation Practice (Cont.Ed.Bar 1985) § 11.17, p. 403; see also *Greener* v. *Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1044-1046 [25 Cal.Rptr.2d 539, 863 P.2d 784].)

We also note the petition was filed more than 45 days after the Board's February 18, 1994, ruling, which indicated that service by mail was made to "all parties listed on the official address record *except lien claimants.*" (§ 5950, italics added.) Ameri-Med stated it did not receive the Board's decision on removal until May 9, 1994. This assertion is uncontroverted. Ameri-Med filed its petition 39 days after it acquired knowledge of the determination, June 17, 1994. Accordingly, we determine the petition was timely filed. (See *Camper* v. *Workers' Comp. Appeals Bd.* (1992) 3 Cal.4th 679, 686-688 [12 Cal.Rptr.2d 101, 836 P.2d 888] and *State Farm Fire & Casualty Co.* v. *Workers' Comp. Appeals Bd.* (1981) 119 Cal.App.3d 193 [173 Cal.Rptr. 778].)

*Lillian Rhooms Case*[13]

Applicant Lillian Rhooms (Rhooms) was employed from September 1976 to April 5, 1990, as a food supervisor by defendant Santa Ana Unified School District (School District), which was self-insured. On May 24, 1990, after a brief hospitalization, Rhooms filed an employee's claim alleging gastrointestinal pain and industrial injury to her psyche due to work-related stress and harassment.

On July 26, 1990, Rhooms sought an internal medical evaluation for medical-legal purposes at the Sand Point Medical Group, a clinic owned by Ameri-Med. Internist Gary M. Stewart, M.D. (Stewart) performed an initial internal medical-legal examination and prepared a report. On or about August 30, 1990, Ameri-Med submitted a medical bill and lien to defendant School District for $1,480 for medical-legal services incurred by Rhooms.[14] The lien was subsequently discharged by School District's $1,150 payment to Ameri-Med.[15]

On September 26, 1991, School District sought restitution/reimbursement of the payment, contending that the charge was unreasonable and that Ameri-Med failed to provide, as requested, and as required by section 4628, a statement itemizing various costs and expenditures. (§§ 4625, 4628.) A hearing was set and School District served on the lien/claimant a notice to attend and produce. School District requested production of "copies of information showing what Dr. Gary M. Stewart was paid for the evaluation he performed on the applicant, Lillian Rhooms . . . . Copies of information are also requested showing what amounts have been paid on this evaluation which reflect reasonable overhead expenses, clerical expenses, tests, and direct physician charges to include reasonable overhead." Ameri-Med interposed vagueness, privacy, and constitutional objections to the production request and the petition for restitution. Ameri-Med subsequently submitted Stewart's declaration that described the physician's financial arrangement with the medical clinic.[16] On June 15, 1993, after a series of hearings, the

[13]Ameri-Medical Corp. v. Workers' Compensation Appeals Board, WCAB No. ANA 236540.

[14]The bill listed a $330 charge for "Review of Medical Records" and a $1,150 charge for an "Internal Initial," described as: "Comprehensive examination including complete medical and surgical history, physical exam, interpretation of appropriate x-ray and lab results, determination of treatment program when indicated & preparation of comprehensive report."

[15]The $1,150 payment was at the 80th percentile level for the medical-legal examination and report. The record is silent as to the date of the payment.

[16]In his declaration, Dr. Stewart stated in relevant part: "5. I performed the initial internal medical/legal examination of the Applicant, Lillian Rhooms, on July 26, 1990. My report of

WCJ granted the School District's petition for restitution and ordered Ameri-Med to pay the defendant $1,150.[17]

On October 29, 1993, Ameri-Med petitioned for reconsideration. In addition to constitutional objections, the petition contended that the request for information concerning Stewart's costs and overhead was unreasonable, impossible to ascertain, and violative of the physician's and the medical clinic's privacy rights.[18] The WCJ recommended denial of reconsideration on the ground that School District was entitled to discover, under section 4628, subdivision (d), the amounts paid to an examining physician, because those costs are material to the issue of whether the bill was reasonable, and

August 6, 1990, accurately reflects the result of the examination, as well as my diagnosis and impressions. [¶] 6. While I was associated with [Ameri-Med], I performed services pursuant to an oral agreement whereby I was paid an agreed-upon amount two (2) times per month in return for my being available to treat, evaluate and examine patients during certain specified hours on specified days of the week. I was not paid on a 'per patient', 'per evaluation', 'per report', 'per examination', 'bonus' or 'incentive' basis. I was paid the same amount regardless of the number of patients that I examined, evaluated and treated and regardless of the number of medical reports that I dictated or authored. I was not required to see any minimum number of patients on any given day or during any given time period. The number of patients that I evaluated, examined or treated varied by the day, by the week, by the month and by the year. There was no true 'average' number of patients I saw or was required to see. I was paid without regard to whether the medical facility received any remuneration as a result of the examination, evaluation or treatment of the patients. [¶] 7. In addition to being paid a specified sum, I was provided with a certain amount of paid vacation time, paid continuing medical education time, and provided with health insurance. I was not required to maintain my own professional malpractice insurance for the services which I performed, as it was agreed that the responsibility for the defense and/or payment of any liability for any alleged negligence during the course and scope of my performing professional services for [Ameri-Med] would be borne by the Medical Corporation. [¶] 8. It is my desire not to reveal the amount which I was paid by [Ameri-Med] during the time period I evaluated Ms. Lillian Rhooms, or during any other time period."

[17]The opinion on decision read, in relevant part: "The lien claim dispute arises from a Petition for Restitution by defendant filed 9/26/91. . . . [¶] The lien of record of Amerimed dba San Point Medical Group (in the amount of $1,480.00) was discharged by payment of $1,150.00 by defendant. The lien claimant stated that this payment was accepted as discharge of the lien of record. . . . [¶] The payment made ($1,150.00) was at the 80th percentile level for the medical-legal examination and report of Dr. Stewart, MD (internal medicine). [¶] The Petition in Restitution is grounded on the claim that the defendant is entitled to obtain basic information regarding the charges for the examination and report of Dr. Stewart. . . . [¶] The lien claimant's refusal to provide any information on the costs (and payments to Dr. Stewart) are based on a number of claims, including the right to privacy. . . . [¶] Assuming, without deciding the claim that the lien claimant has a right to deny information regarding the costs of the examination and report of Dr. Stewart, the lien claimant has no constitutional right to charge and collect the medical-legal lien without providing information regarding the reasonable bans [sic] of the amounts charged and collected."

[18]In opposition, the School District argued only that Ameri-Med's petition was untimely and failed to address any of the substantive issues.

because the figures should be ascertainable. On December 27, 1993, the Board denied Ameri-Med's petition.[19]

Ameri-Med timely filed a petition for review.

## DISCUSSION

### I. Subdivision (d) of Section 4628 Furthers the Anti-ghostwriting Purpose of the Statute by Prohibiting Reimbursement for Services Not Actually Performed.

The heart of Ameri-Med's argument is that section 4628, subdivision (d), controls the fees a medical clinic can charge for preparation of medical-legal reports. Ameri-Med contends that to the extent this statute, as applied, operates as a price control, it prohibits the clinic from realizing any profit and unconstitutionally violates due process and equal protection rights. Ameri-Med's argument is flawed because it is based on the erroneous premise that subdivision (d) is a fee regulation statute. Neither the legislative history nor the plain meaning of the statute support its position. Accordingly, Ameri-Med's constitutional arguments are without merit.

For reasons explained below, we conclude that section 4628, subdivision (d) does not regulate fees or prices, but merely implements the "anti-ghostwriting" purpose of section 4628 by prohibiting physicians and medical clinics from billing or being compensated for services not actually performed.

■ Interpreting section 4628, subdivision (d), we begin with a fundamental rule of statutory construction "that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] Additionally, however, we must consider [subdivision (d)] in the context of the entire statute [section 4628] and the statutory scheme of which it is a part. 'We are required to give effect

---

[19]In the order denying reconsideration, the Board stated: "At the outset, we note that lien claimant was not served with the June 25 [sic], 1993 decision. Its petition, filed October 29, 1993, is timely filed from the date lien claimant received the decision on October 4, 1993. [Citation.] [¶] We have considered the allegations of the Petition for Reconsideration and the contents of the report of the workers' compensation judge with respect thereto. Based on our review of the record, and for the reasons stated in said report which we adopt and incorporate, we will deny reconsideration."

to statutes "according to the usual, ordinary import of the language employed in framing them." [Citations.]' [Citations.] ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . . "When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' [Citations.]" (*DuBois* v. *Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387-388 [20 Cal.Rptr.2d 523, 853 P.2d 978]; see also *Hutchinson* v. *Workers' Comp. Appeals Bd.* (1989) 209 Cal.App.3d 372, 375-376 [257 Cal.Rptr. 240].)

This last rule is exceedingly important in light of the efforts made by the Legislature since 1989 to correct abuses associated with the high cost of medical-legal reports and to reform the workers' compensation system. (See *American Psychometric Consultants, Inc.* v. *Workers' Comp. Appeals Bd.*, *supra*, 36 Cal.App.4th 1626, 1639.) To determine whether the Legislature intended subdivision (d) of section 4628 to limit the *amount* of the fees and costs that can be reimbursed for preparation of the report, or merely limit the *types* of costs that can be included in the report fee, we look not only to the language of the statute, but also to "the legislative enactments of which it is a part." (*DuBois* v. *Workers' Comp. Appeals Bd.*, *supra*, 5 Cal.4th at p. 388.) This includes an examination of Assembly Bill Nos. 276 and 2196 and related legislation. These bills show that the Legislature created separate statutory schemes. One scheme responds to the problem of containing costs in the preparation of medical-legal reports. The other scheme responds to the problem of defining the types of permissible reimbursable costs that can be charged for the preparation of the report.

A. *Legislative Efforts to Contain Costs*

Medical-legal expenses, which include the medical-legal reports, are defined by section 4620 as "those incurred 'for the purpose of proving or disproving a contested claim.'" (*American Psychometric Consultants, Inc.* v. *Workers' Comp. Appeals Bd.*, *supra*, 36 Cal.App.4th at p. 1639; see also Cal. Code Regs., tit. 8, § 9793.) "Medical-legal fees are a significant part of the total cost of workers compensation. The California Workers' Compensation Institute has estimated that medical-legal fees were more than $700 million in 1990. The Workers Compensation Research Institute . . . estimates fees in 1992 to have been over $1 billion, or about nine percent of total workers compensation costs. These high costs can be attributed to both the high cost

per report and the number of reports generated by each case. [¶] The California Institute found that the number of reports per litigated case increased from an average of 2.8 in 1984 to 3.6 in 1990. They also found that the average cost per case for medical-reports has increased from $1,405 in 1984 to $3,317 in 1990." (Sen. Floor Analysis, Unfinished Business, for Sen. Bill No. 31 (1993-1994 Reg. Sess.).) The Legislature attempted to resolve the problem.

 1. *Assembly Bill No. 2196 Established a Schedule of Presumptively Reasonable Rates.*

In March 1983, the Temporary Advisory Committee on Medical-Legal Expenses (Committee), appointed pursuant to chapter 1150 of the Statutes of 1981, made written recommendations to the Legislature regarding the workers' compensation system. The Committee was concerned with "[t]he continued availability of competent physicians to evaluate physical impairment resulting from industrial injury," "[t]he absence of uniform, valid and acceptable standards to determine unreasonable or excessive charges," "[t]he appropriate use of industrial medical-legal services," "[t]he quality of industrial medical-legal reports," and the "[p]rompt payment of reasonable fees for industrial medical-legal services." (Rep. of Temporary Advisory Com. on Medical-Legal Expenses, Mar. 1983, Assem. Bill No. 2196 (1983-1984 Reg. Sess.) p. 2.)

In reported findings, the Committee stated, in relevant part, that its recommendations were "designed to establish standardized criteria for the evaluation of medical-legal expenses on a consistent basis. Committee believes that its proposal will provide a basis for the payor [*sic*] of industrial medical-legal services to make a timely determination of whether the charges are appropriate and therefore subject to timely payment, yet not be unduly restrictive thus allowing the physician providing the services to be fully compensated for the reasonable value of those services." (Rep. of Temporary Advisory Com. on Medical-Legal Expenses, Mar. 1983, Assem. Bill No. 2196, ch. 596, *supra*, at p. 6.) The Committee also recommended the development of fee ranges by medical specialty and the establishment of the 80th percentile, which is "that dollar value at or below which 80 per cent of all physician charges fall," as a criteria of reasonableness of the fee. (*Id.* at p. 8.) A fee at or below the 80th percentile, according to the Committee, would be deemed rebuttably reasonable. (*Ibid.*) However, "[w]e provide for some flexibility in that the payor [*sic*] can rebut charges which fall at or below the 80th percentile or the physician can provide information to support charges higher than the 80th percentile. The point is that our

recommendations are benchmarks *not* absolutes. They must be viewed with some degree of elasticity." (*Id.* at p. 9.)

During the 1983-1984 Regular Session, the Committee's recommendations were incorporated into Assembly Bill No. 2196, which added article 2.5 (medical-legal expenses), consisting of sections 4620-4627.[20, 21] (See Rep. of Temporary Advisory Com. on Medical-Legal Expenses, Mar. 1983, Assem. Bill No. 2196, *supra*.) The new statutory scheme "prescribe[d] fee guidelines for independent medical examiners based on data collected from physicians in the particular medical specialty regarding the fee charged for the type of report requested." (Cal. Workers' Compensation Practice (Cont.Ed.Bar Supp. 1984) § 7.17, p. 25.) The bill required the publication of "a schedule based on the range of medical-legal fees that specified medical specialists actually charged during the previous 12 months," made "it a rebuttable presumption that all medical-legal fees are appropriate if they fall under the 80th percentile of the ranges[,]" and "[urged] the Governor to implement a suggestion by the Temporary Advisory Committee on Medical-Legal Expenses that the [Industrial Accidents] division study the incidence of physician 'shopping' and overutilization of industrial medical-legal services and to make appropriate recommendations." (Analysis of Assem. Bill No. 2196 (Jan. 17, 1984) p. 2 (McAlister) (1983-1984 Reg. Sess.).) A legislative analysis determined "the bill probably would not result in additional costs to local public agencies because, if anything, the new schedule would reduce costs associated with medical-legal fees in two ways. First, it would reduce costs to the extent that it reduced fees that currently exceed the 80th percentile in cases where there is no justification for the payment of higher fees. Second, it would reduce litigation before the workers' compensation appeals board over the appropriateness of fees that are currently

---

[20]The Legislative Counsel's Digest stated, in relevant part: "This bill would . . . enact new provisions providing for the reimbursement of medical-legal expenses, as defined, which are reasonably, actually, and necessarily incurred. The bill would provide the method and manner of reporting, billing, and paying of medical-legal expenses, would require the administrative director, annually, . . . , to publish the range of industrial medical-legal fees charged by independent medical examiners, agreed medical examiners, and physicians examining for either the applicant or the defendant . . . , and would make other related changes with regard to medical-legal expenses. [¶] This bill would also provide that the changes made by the bill are pursuant to recommendations made by the Temporary Advisory Committee on Medical-Legal Expenses . . . ." (Legis. Counsel's Dig., Assem. Bill No. 2196, 4 Stats. 1984 (Reg. Sess.) Summary Dig., p. 204.)

[21]The Historical Note for section 4620 states, in relevant part: " 'The amendments made by this act are pursuant to recommendations made by the Temporary Advisory Committee on Medical-Legal Expenses created by Chapter 1150 of the Statutes of 1981. The committee also *suggested that the administrative director consider conducting an examination into the incidence of physician "shopping" and over-utilization of industrial medical-legal services and develop recommendations for the elimination of any improprieties.*' " (Historical Note, 44A West's Ann. Lab. Code (1989 ed.) § 4620, p. 440.)

charged. Such disputes are currently handled on a case-by-case basis. . . . " (Analysis of Assem. Bill No. 2196 (McAlister), *supra*, p. 3.)

While the other newly added code sections addressed issues of payment and reimbursement, section 4624[22] established a market-survey-based method of setting rates under which the administrative director of the Division of Industrial Accidents annually polled and then published "the range of fees for initial comprehensive industrial medical-legal reports charged by . . . physicians." (former § 4624, subd. (a).) This statute provided for rebuttably presumed reasonable rates set at the 80th percentile of this range. (former § 4624, subd. (c).) In 1990, the Legislature repealed original section 4624 and adopted a substantially similar statute. This new statute lowered the rebuttably presumed reasonable rates to the 73d percentile of the fee range, and made the rate rebuttably presumed reasonable "notwithstanding any other section of this article." (§ 4624, subds. (a), (c).)

## 2. *Senate Bill No. 31 and Subsequent Reform of the Fee Schedule*

The medical-legal fees, however, continued to rise and the Legislature attempted to address this concern with the 1993 passage of Senate Bill No. 31. (See also *American Psychometric Consultants, Inc.* v. *Workers' Comp. Appeals Bd.*, *supra*, 36 Cal.App.4th at p. 1641.) The bill required the administrative director to adopt and revise a medical-fee schedule that would be "prima facie evidence of the reasonableness of fees charged for medical-legal expenses" rather than merely publish a range of fees charged by independent physicians. The bill also prohibited medical providers "from charging more than the fees allowed by the medical-legal fee schedule except upon showing that the higher fee is reasonable and justified by extraordinary circumstances." (Sen. Floor Analysis, Unfinished Business for Sen. Bill No. 31, *supra*, p. 2.) To this end, the bill amended sections 4620-4622 and 4625, repealed section 4624, and added section 5307.6,

---

[22]Section 4624 formerly provided: "(a) Annually, commencing on November 1, 1986, the administrative director shall publish the range of fees for initial comprehensive industrial medical-legal reports charged by independent medical examiners, agreed medical examiners, and physicians examining for either the applicant or defendant for the 12 months ending the previous June 30. [¶] (b) The range of charges shall be shown by five specialty categories: orthopedics, internal medicine and cardiology, neurology, psychiatry, and all others. The 80th percentile of these charges, . . . , shall be shown in all instances. [¶] (c) Charges of all physicians providing initial comprehensive industrial medical-legal reports shall be rebuttably presumed reasonable if the charges do not exceed the 80th percentile of fees in the appropriate specialty as established in subdivision (b). Charges exceeding the 80th percentile for the involved specialty may be found reasonable if accompanied by supporting information provided by the physician." (Stats. 1989, ch. 892, § 32, p. 3015.)

which established the fee schedule.[23] (See Legis. Counsel's Dig., Sen. Bill No. 31 (1993-1994 Reg. Sess.) ch. 4 and Board rule 9795 (Cal. Code Regs., tit. 8, § 9795).)[24] The bill was subsequently amended by provisions in Assembly Bill No. 110 which required the administrative director, among other items, "to set medical-legal fees based on the relative difficulty of the work and time expended in contact with the patient and in preparing the report." (Sen. Rules Com. Conference Rep. on Assem. Bill No. 110 (1993-1994 Reg. Sess.) pp. 6-8; Prop. Conference Rep. No. 2, Assem. Bill No. 110, as amended May 5, 1993 (1993-1994 Reg. Sess.).)

Assembly Bill Nos. 110 and 2196 and Senate Bill No. 31 sought to lower costs associated with medical-legal fees by placing limits on the amount medical providers could charge, and to reduce litigation by creating presumptively reasonable rates. This was accomplished by enacting Labor Code provisions, and concurrent regulations, that set and controlled the level and range of fees. As we can determine from the legislative history of these bills,

[23]Section 5307.6 formerly provided:

"(a) The administrative director shall adopt and revise a fee schedule for medical-legal expenses as defined by Section 4620, which shall be prima facie evidence of the reasonableness of fees charged for medical-legal expenses, at the same time he or she adopts and revises the medical fee schedule pursuant to Section 5307.1.

"The schedule shall consist of a series of procedure codes, relative values, and a conversion factor producing fees which provide remuneration to physicians performing medical-legal evaluations at a level equivalent to that provided to physicians for comparable work and which additionally recognizes the relative complexity of various types of medical-legal evaluations, the amount of time spent by the physician in direct contact with the patient, and the need to prepare a written report.

"(b) A provider shall not charge fees in excess of those set forth in the official medical-legal fee schedule unless the provider provides an itemization and explanation of the fee that shows that it is both a reasonable fee and that extraordinary circumstances justify a higher fee; provided, however, that in no event shall a provider charge in excess of his or her usual fee.

"(c) In the event of a dispute between the provider and the employer or carrier concerning the fees charged, the provider may be allowed a reasonable fee for testimony if the provider testified pursuant to the employer's or carrier's subpoena and the judge or referee determines that the fee charged was reasonable and justified by extraordinary circumstances." (Stats. 1993, ch. 4, § 8.)

[24]Pursuant to section 4627, "[t]he board and the administrative director may promulgate such reasonable rules and regulations as may be necessary to interpret this article and compel compliance with its provisions."

Title 8, California Code of Regulations, section 9795 provides, in relevant part: "(a) The schedule of fees set forth in this section shall be prima facie evidence of the reasonableness of fees charged for medical-legal evaluation reports, and fees for medical-legal testimony. [¶] . . . . [¶] (b) The fee for each procedure is calculated by multiplying the relative value by $10.00, and adding any amount applicable because of the modifiers permitted under subdivision (d). The fee for each medical-legal evaluation procedure is all inclusive, and includes reimbursement for the examination, review of records, preparation of a medical-legal report, and overhead expenses. The complexity of the evaluation is the dominant factor determining the appropriate level of service under this section; . . . ."

the established fees were developed to "provide remuneration to physicians performing medical-legal evaluations at a level equivalent to that provided to physicians for comparable work" (former § 5307.6, subd. (a)) and at a level to provide adequate compensation for the evaluating physician's services.

Even though fees established pursuant to the schedule are considered prima facie reasonable maximum fees, the determination of reasonableness is rebuttable. (Cal. Workers' Compensation Practice (Cont.Ed.Bar Supp. 1995) § 8.39, p. 154; see §§ 4621-4622, 5307.6.) Section 4625 specifically provides that when an employer/carrier contests the reasonableness of a charge, the employer must pay the amount presumed reasonable but can petition for reimbursement of amounts challenged as unreasonable. (Cal. Workers' Compensation Practice (Cont.Ed.Bar 1985) § 14.91, p. 612.) "[A] provider can recover a fee in excess of one prescribed by the schedule only by submitting an itemization and explaining the extraordinary circumstances that justify the claim. Lab C § 5307.6." (Cal. Workers' Compensation Practice, *supra*, at § 14.90, p. 248; see also, *Gould* v. *Workers' Comp. Appeals Bd.*, *supra*, 4 Cal.App.4th at p. 1071.) The Board determines what constitutes a reasonable charge, by such factors enumerated in *Gould*, as ". . . evidence regarding the medical provider's training, qualifications, and length of time in practice; the nature of the services provided; the fees usually charged by the medical provider; the fees usually charged in the general geographical area in which the services were rendered; other aspects of the economics of the medical provider's practice that are relevant; and any unusual circumstances in the case." (*Id.* at p. 1071.)

At the same time, the Legislature separately addressed the problem of ghostwritten medical-legal reports and attempted to ensure the quality of the medical evaluations.

### B. *Legislative Efforts to Prohibit Ghostwriting*

#### 1. *Assembly Bill No. 276 Included Anti-ghostwriting Provisions to Ensure the Quality of Medical Evaluations.*

■■■ ". . . [I]n litigation of injured workers' claims for workers' compensation benefits, the medical evaluation report is a crucial element of proof, if not the most crucial element, considered by the WCJ in deciding the issues." (*Crawford* v. *Workers' Comp. Appeals Bd.*, *supra*, 213 Cal.App.3d at p. 169.) The reliability of the evaluation, as reflected in the report, goes to the core issue of the compensability of the claim.

In *Crawford* v. *Workers' Comp. Appeals Bd.*, *supra*, the court considered a matter in which a psychiatric expert witness was charged with contempt for

failure to disclose the names of all persons who assisted in preparing medical reports he submitted in workers' compensation cases, in violation of California Code of Regulations, title 8, chapter 4.5, section 10606 (Rule 10606). (213 Cal.App.3d at pp. 160-163.) In considering the purpose of Rule 10606, the court relied on the reasoning in *In re Nussdorf* (1981) 46 Cal.Comp.Cases 189, 192, footnote 3 (in bank) which stated: " 'Knowledge of the identity of the person performing a physical examination of a workers' compensation claimant is extremely important to both the finder of fact and the parties in a workers' compensation setting. The person who performs the physical examination makes crucial judgments as to the validity of a claimant's complaints and symptoms. The finder of fact and the parties are entitled to know that person's identity so that they may weigh his or her qualifications and reputation, and may have the opportunity for cross-examination. If a workers' compensation judge or the [WCAB] receives a report signed by a physician which does not otherwise disclose that the physician's opinions stated in that report are based in part upon the findings of a physical examination not performed by the reporting physician, then the judge or the [WCAB] would reasonably conclude that the signing physician had performed the physical examination, and would therefore be misled about a crucial issue.' [Citation.]" (213 Cal.App.3d at p. 168.)

The rationale of *Nussdorf* is applicable, in our case, to all aspects of the preparation of the medical-legal report. In order to rely on the findings of injury and the medical impressions which are important to the final diagnosis, the WCJ needs to know that the physician who prepared the report also took the medical history, conducted the examination and recommended the course of treatment. Where the report is based on a cursory examination, or prepared over a physician's signature by a typist who merely inserts boilerplate paragraphs into the report, the document is useless to the WCJ, who must rely on the findings in the report to determine issues in a case.

Section 4628 was part of the new workers' compensation law enacted in 1989 by Assembly Bill No. 276.[25] The bill was a comprehensive proposal to improve and restructure the California workers' compensation system by amending and adding code sections to change the workers' compensation benefit system and procedures relating to psychiatric injuries, vocational rehabilitation, and evaluation of medical issues. (Conference Rep. on Assem. Bill No. 276 by Office of Sen. Floor Analysis (Sept. 15, 1989); Industrial Relations Enrolled Bill Rep. (Sept. 19, 1989).) To ensure the quality of the medical evaluations, the bill included, among others, anti-ghostwriting provisions to prohibit "[a]nyone other than the doctor signing the report . . .

[25]Assembly Bill No. 276 is referred to as the Margolin-Bill Greene Workers' Compensation Reform Act of 1989. (Stats. 1989, ch. 892, pp. 2982-3039.)

from conducting the examination or participating in the medical aspects of preparing evaluation reports." (Sen. Com. on Industrial Relations (Nov. 1989) Margolin-Bill Greene Workers' Compensation Reform Act of 1989, Summary of Major Provisions, p. 11.)

In recommending reforms in the area of medical-legal issues, the conference report on Assembly Bill No. 276 by the Office of Assembly Floor Analysis observed that "[e]xisting law provides that an injured employee is to be reimbursed by the employer or the employer's insurance carrier for his or her medical-legal expenses reasonably, actually, and necessarily incurred to establish his or her workers' compensation claim." (At pp. 2-3.) One of the recommended amendments was to "[e]stablish penalties for ghost-writing medical evaluations." (Id. at p. 3.) The conference report by the Office of Senate Floor Analysis stated "[t]he bill would generally prohibit any person other than the physician who signs the report from examining the employee or participating in the nonclerical preparation of the report. Charges for a report would be limited to the physician's professional services, including overhead expenses, and the reasonable cost of laboratory examinations, diagnostic studies, other medical tests, and the clerical expense of producing the report." (Id. at p. 13.)

The Legislature incorporated the anti-ghostwriting reform provisions into section 4628, which formerly read:

"(a) Except as provided in subdivision (c), no person, other than the physician who signs the medical-legal report, except a nurse performing those functions routinely performed by a nurse, such as taking blood pressure, shall examine the injured employee or participate in the nonclerical preparation of the report, including all of the following:

"(1) Taking a complete history.

"(2) Reviewing and summarizing prior medical records.

"(3) Composing and drafting the conclusions of the report.

"(b) The report shall disclose the name and qualifications of any person who administers diagnostic studies.

"(c) If the initial outline of a patient's history or excerpting of prior medical records is not done by the physician, the physician shall review the excerpts and the entire outline with the patient and shall make additional inquiries and examinations as are necessary and appropriate to identify and determine the relevant medical issues.

"(d) *No amount may be charged in excess of the direct charges for the physician's professional services and the reasonable costs of laboratory examinations, diagnostic studies, and other medical tests, and reasonable costs of clerical expense necessary to producing the report. Direct charges for the physician's professional services shall include reasonable overhead charges.*

"(e) Failure to comply with the requirements of this section shall make the report inadmissible as evidence and shall eliminate any liability for payment of any medical-legal expense incurred in connection with the report.

"(f) Knowing failure to comply with the requirements of this section shall subject the physician to a civil penalty of up to one thousand dollars ($1,000) for each violation to be assessed by a workers' compensation judge or the appeals board.

"(g) A medical-legal report of any physician who is assessed a civil penalty under this section shall not be admissible in any proceeding of the appeals board.

"(h) Knowing failure to comply with the requirements of this section shall subject the physician to contempt pursuant to the judicial powers vested in the appeals board." (Stats. 1989, ch. 892, § 32.5, p. 3016, italics added.)[26]

2. *Section 4628, Subdivision (d)*

 Ameri-Med contends section 4628, subdivision (d) is a fee regulation statute. We disagree. While the Legislature has used words inartfully in the statute which may connote fee regulation such as "amount," "charges," "costs," and "reasonable overhead expenses," we must not consider these words out of context from the statute itself, the statutory scheme and the legislative intent. Section 4628, subdivision (d) was part of an anti-ghost-writing statute. The Legislature created a separate scheme to address issues of fees and cost containment.

We determine subdivision (d) was enacted as a part of section 4628's mandate to ensure the reliability of the medical evaluation by prohibiting the

---

[26]The statute, as originally enacted, was applicable to injuries occurring after January 1, 1990. While there have been subsequent statutory changes (which are not relevant to our discussion), and the addition of subdivisions (i), (j) and (k), subdivision (d) has remained unchanged.

ghostwriting of medical-legal reports. Subdivisions (a), (b) and (c) delineate the responsibilities of the physician signing the report. Subdivision (d) furthers the anti-ghostwriting intent by enumerating the permissible *types* of charges, all related to and limited to the physician's responsibilities listed in subdivisions (a), (b), and (c), that can be reimbursed as costs for the preparation of the report. Included among the permissible fees and costs are the "direct charges for the physician's professional services," which are listed in subdivisions (a) and (c). Subdivisions (a), (b), (c), and (d) are to be read together. Under the plain meaning of the statute, a medical clinic can bill for the fees charged, and costs incurred, including overhead, by the physician who actually conducts the examination and prepares the report. The statute merely limits the *types* of charges that can be reimbursed; it does not limit the *amount* of the charges that can be billed. As such, it neither regulates fees nor operates as a price control statute. The amount that can be billed is limited by section 5307.6 and section 9795 of the California Code of Regulations, title 8. Our interpretation of section 4628, subdivision (d) finds Ameri-Med's constitutional arguments without merit and irrelevant to the application of the statute.

Ameri-Med contends that section 4628, subdivision (d) is a fee regulation statute that precludes billing for more than the fees charged and the costs incurred by the examining physician, and infringes on the right of the medical clinic to make a profit. Therefore, Ameri-Med argues, this renders the statute invalid under the due process and equal protection clauses of the United States and California Constitutions.

First, Ameri-Med's substantive due process argument rests on the mistaken claim that section 4628, subdivision (d) unconstitutionally restricts what clinics can properly charge for medical services rendered to individuals with work-related injuries. "The notion of 'substantive' due process is normally associated with attacks on legislative exercises of the police power, that is, the enactment of statutes or adoption of legislation." (*Grupe v. California Coastal Com.* (1985) 166 Cal.App.3d 148, 168 [212 Cal.Rptr. 578].) " '. . . [T]he burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.' [Citation.] We therefore consider the sufficiency of the evidence of a substantive due process violation arising from arbitrary or irrational actions." (*Stubblefield Construction Co.* v. *City of San Bernardino* (1995) 32 Cal.App.4th 687, 709 [38 Cal.Rptr.2d 413].)

 In our case, a legislative enactment limiting the *types* of permissible charges to those related to the examining and signing physician "is valid

under substantive due process if it reasonably relates to a legitimate governmental purpose." (*Grupe* v. *California Coastal Com.*, *supra*, 166 Cal.App.3d at pp. 168-169.) Ameri-Med never disputes that the asserted purpose of section 4628 was to prevent ghostwriting. The clinic, however, has misinterpreted subdivision (d) by reading the limitation in the statute as directed to the *amount* of permissible charges and the issue of profits. By doing so, Ameri-Med created its own constitutional argument which is more appropriately directed against the fee regulation statutes and the fee schedule. The statutory limitations imposed on the types of reimbursable charges by section 4628, subdivision (d), are reasonably related to, and are an appropriate means of furthering, the anti-ghostwriting purpose of section 4628. (See *Grupe* v. *California Coastal Com.*, *supra*, 166 Cal.App.3d at p. 169, fn. 16.) Accordingly, section 4628 subdivision (d) does not violate Ameri-Med's substantive due process rights.

Nothing in section 4628, subdivision (d) either restricts the amount that can be charged or abrogates the clinic's ability to make a profit. It only precludes billing for services the physician did not perform. Subdivision (d) established not only that the Legislature did not want medical providers to submit ghostwritten reports, but also did not want them to bill for ghostwritten reports.

As previously discussed, fee schedules, which determined the range of the physician's reimbursable charges depending on the type of examination performed and report written, were developed pursuant to sections 4624 and 5307.6. The schedule was based on fees charged by physicians performing similar services, and is revised on a regular basis. Determination of the fee amount takes into consideration factors such as "the medical provider's training, qualifications, and length of time in practice; the nature of the services provided; . . . the fees usually charged in the general geographical area in which the services were rendered; [and] other aspects of the economics of the medical provider's practice that are relevant." (*Gould* v. *Workers' Comp. Appeals Bd.*, *supra*, 4 Cal.App.4th at p. 1071.) It would be unreasonable to assume these physicians did not include a percentage of profit margin in establishing their fees. Accordingly, if Ameri-Med is concerned with the issue of profit, its argument is more appropriately directed at sections 4624 and 5307.6, and those concerns should be addressed to the Legislature. Ameri-Med cannot legitimately use an attack on a statute that merely limits the type of permissible reimbursable fees as a vehicle to question the rates in the fee schedule.

Second, we also determine section 4628, subdivision (d) does not violate Ameri-Med's equal protection guarantees. The clinic's argument

rests on the claim that, as applied, the statute discriminates against a medical clinic's ability to make any profit, because unlike private physicians practicing independently, the clinics are not able to charge any more for services provided than the amount of compensation paid to the evaluating physician by the clinic, and "reasonable overhead expenses."

■ To determine a violation of equal protection guarantees, we apply a deferential standard to ascertain if the classification scheme embodied in the statute is " 'rationally related to a legitimate state interest,' " and " 'we will not overturn [a statute that does not burden a suspect class or a fundamental interest] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.' [Citation.]" (*Pennell* v. *San Jose* (1988) 485 U.S. 1, 14 [99 L.Ed.2d 1, 16, 108 S.Ct. 849].) " 'In performing this analysis, we are not bound by explanations of the statute's rationality that may be offered by litigants or other courts. Rather, those challenging the legislative judgment must convince us "that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." [Citation.]' " (*Stubblefield Construction Co.* v. *City of San Bernardino, supra,* 32 Cal.App.4th at p. 713.) " 'In order to prevail, [Ameri-Med] must make a showing that a class that is similarly situated has been treated disparately.' [Citation.]" (*Id.* at p. 714.)

■ There are three basic problems with Ameri-Med's argument. First, Ameri-Med, a medical clinic, is not in the same class as a physician for equal protection analysis. Ameri-Med does not contend that the statute treated it differently from other clinics and medical providers similarly situated. Second, as previously concluded, section 4628, subdivision (d) was enacted to serve the legitimate purpose of preventing ghostwriting by prohibiting reimbursement of costs for physician services not actually performed. There is nothing arbitrary or unreasonable in limiting the type of reimbursable fees and costs. The statute applies to all physicians treating individuals with work-related injuries, and does not distinguish between private physicians and those employed by or associated with a medical clinic. Third, Ameri-Med must show proof of differing treatment. Since the clinic failed to provide any such evidence, its equal protection argument must fail. (See *Stubblefield Construction Co.* v. *City of San Bernardino, supra,* 32 Cal.App.4th at p. 714.)

Ameri-Med's final argument is that section 4628, subdivision (d) is unconstitutionally vague because its language fails to provide the clinic

sufficient notice of proscribed acts so that it may avoid any statutory penalties. This argument is premature. As previously stated, we do not and need not decide what specific costs may be included or considered as "direct physician charges," as "reasonable," or as "overhead expenses" because the issue as to inclusion or rejection of specific fees and costs from the lien/bill is not before this court. The Board has the discretion to make those determinations. Moreover, these cases come before this court at the pleading and discovery stage. No penalties have been assessed against any of the clinic's physicians. (See § 4628, subds. (f), (h).) Whether Ameri-Med, in addition to or in lieu of its physicians, can also be subject to these statutory penalties is not an issue before this court. Therefore, we will not decide any presumed conduct issues addressed in Ameri-Med's petitions.

Furthermore, Ameri-Med's discussion of quasi-criminal statutes is irrelevant. The present proceedings raise only questions of potential liability for "civil" penalties pursuant to section 4628, subdivision (f), whether respondents are relieved of liability for Ameri-Med's liens under section 4628, subdivision (e), and whether Ameri-Med's reports are admissible under section 4628, subdivision (e). Contempt proceedings pursuant to section 4628, subdivision (h) have not been initiated in these cases. Such a proceeding would require a separate hearing with a different standard of proof. (See *Crawford* v. *Workers' Comp. Appeals Bd.*, *supra*, 213 Cal.App.3d at p. 164.) Ameri-Med is not seeking to enjoin the Board from proceeding against it for contempt. Ameri-Med is seeking to restrain the Board from enforcing the discovery orders in the underlying "civil" proceeding.

Section 4628, subdivision (d), as properly interpreted, does not have the unconstitutional infirmities alleged by Ameri-Med.

We next address the issue of whether the discovery requested by respondents pursuant to section 4628, subdivision (d) violates Ameri-Med's right to financial privacy.

II. *Ameri-Med Has a Limited Right to Privacy in Its Financial Records*

 Ameri-Med contends that respondents' discovery requests constitute an impermissible invasion of the right to financial privacy.[27] Under the facts of this case, we find that Ameri-Med does not have a constitutionally

---

[27]Ameri-Med seems to assert the constitutionally protected privacy rights of the individual physicians associated with the medical clinic. The difficulty with Ameri-Med's position is we do not know whether the physicians (Franco, Kreman, and Stewart) were employees of Ameri-Med or did work for the clinic as independent contractors. The record is silent as to

protected interest in its financial records, but it does maintain a limited privacy right in financial information related to billings for reimbursable costs and fees.

Discovery is permissible if the requested information is "not privileged," "is relevant to the subject matter involved in the pending action," and "appears reasonably calculated to lead to the discovery of admissible evidence." (Code Civ. Proc., § 2017, subd. (a); *Willis* v. *Superior Court* (1980) 112 Cal.App.3d 277, 289 [169 Cal.Rptr. 301].) "In *Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 173 [84 Cal.Rptr. 718, 465 P.2d 854], it was stated: '. . . the relevance of the subject matter standard must be reasonably applied; in accordance with the liberal policies underlying the discovery procedures, doubts as to relevance should generally be resolved in favor of permitting discovery [citation].' (Fns. omitted.)" (*Id.* at pp. 289-290.) The right to privacy in disclosure of financial information affects the scope of discovery.

"Our right to privacy is guaranteed and protected by state and federal Constitutions." (*Palay* v. *Superior Court* (1993) 18 Cal.App.4th 919, 931 [22 Cal.Rptr.2d 839].) A 1974 amendment to the California Constitution added article I, section 1, which states: " 'All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy*.' (Italics added.)" (*Board of Trustees* v. *Superior Court* (1981) 119 Cal.App.3d 516, 524 [174 Cal.Rptr. 160].) "The drive behind the constitutional amendment was an acknowledgment that '[f]undamental to our privacy is the ability to control circulation of information.' (*White* v. *Davis* [1975] 13 Cal.3d 757, 774, . . .)" (*Palay* v. *Superior Court, supra*, 18 Cal.App.4th at p. 932.) ■ However, "[t]he constitutional provision simply does not apply to corporations. The provision protects the privacy rights of *people*." (*Roberts* v. *Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 791 [195 Cal.Rptr. 393].) Therefore, Ameri-Med has no standing to assert a constitutional right to privacy. (*Id.* at p. 793.) It does not mean, however, Ameri-Med has no privacy rights.

"Although corporations have a lesser right to privacy than human beings and are not entitled to claim a right to privacy in terms of a fundamental

whether the Board made such a determination. In the physician's declarations, they generally explain their financial arrangements with Ameri-Med, but merely refer to themselves as being "associated" with the medical clinic. Accordingly, we consider the privacy issue only as it relates to Ameri-Med.

right, some right to privacy exists. Privacy rights accorded artificial entities are not stagnant, but depend on the circumstances. *United States* v. *Hubbard* [(D.C. Cir. 1980)] 650 F.2d 293 [208 App.D.C. 399] speaks to this point: 'However, we think one cannot draw a bright line at the corporate structure. The public attributes of corporations may indeed reduce *pro tanto* the reasonability of their expectation of privacy, but the nature and purposes of the corporate entity and the nature of the interest sought to be protected will determine the question whether under given facts the corporation *per se* has a protectible privacy interest. . . .' (At pp. 306-307, fns. omitted; . . .) [¶] It is clear to us that the law is developing in the direction that the strength of the privacy right being asserted by a nonhuman entity depends on the circumstances. Two critical factors are the strength of the nexus between the artificial entity and human beings and the context in which the controversy arises." (*Roberts* v. *Gulf Oil Corp.*, *supra*, 147 Cal.App.3d at pp. 796-797.)

■ In our case, respondents Transamerica and the School District have questioned the bills submitted by Ameri-Med for preparation of medical-legal reports and have asserted a section 4628, subdivision (d) objection to payment. Sections 4621, 4622, 5307.1, and 5307.6 provide respondents a mechanism to challenge the reasonableness of the charges for medical-legal expenses. Sections 5307.1 and 5307.6 require Ameri-Med to provide sufficient itemization to justify its costs and fees. Therefore, the medical clinic cannot argue it had an expectation of privacy in the financial data used to prepare the billing/liens.

To discover whether Ameri-Med violated section 4628, subdivision (d), respondents requested from the medical clinic certain financial data which included physician employee agreements and payment records. While respondents have a legitimate interest in determining whether nonreimbursable fees and costs have been included in the total amount of the bill, they do not have an automatic right to unfettered access to books and records regarding the medical clinic's overall business operation. Ameri-Med retains a privacy interest in financial and employment information unrelated to either the preparation of Lizzi's and Rhooms's medical-legal reports or the cost categories specified in subdivision (d).

Discovery pursuant to section 4628, subdivision (d), is limited to the categories of information that constitute the types of permissible charges enumerated in the statute. This information is relevant to the issue of whether nonreimbursable fees and costs were included in the total amount of

the lien claimant's lien/bill, and the credibility and reliability of the medical-legal report. Respondents are entitled to relevant and unprivileged information that will assist them in determining (1) the medical services performed by the physician signing the report, (2) the amount of direct charges for that physician's professional services, and (3) the amount of the reasonable costs for lab exams, diagnostic studies, medical tests, and clerical expense related to producing the report. The issue of what discovery can be included within these categories and whether respondents' requests should be permitted, are best addressed by the Board, which is in a better position to define the scope of discovery. We note, however, tax returns are not discoverable. (*Schnabel v. Superior Court* (1993) 5 Cal.4th 704, 718-721 [21 Cal.Rptr.2d 200, 854 P.2d 1117]; *Webb v. Standard Oil Co.* (1957) 49 Cal.2d 509, 512-514 [319 P.2d 621].)

We further note that discovery under these developed guidelines will enable the Board to determine the allowable amount of fees and charges that the lien claimant billed for preparation of the medical-legal report, and whether the fees charged by the lien claimant are reasonable. To that end, in order to obtain payment, the lien claimant must establish that (1) the physician has charged fees pursuant to the medical-fee schedule, or a proper justification has been made for fees in excess of the schedule (§ 5307.1, subd. (b)), *and* (2) if challenged, there was compliance with the provisions of section 4628, subdivision (d) in the preparation of the bill/lien. Ameri-Med, and other medical providers, must make a proper showing under both of these prongs to receive payment for medical-legal reports.

### DISPOSITION

In Ameri-Medical Corp. et al. v. Workers' Compensation Appeals Board, WCAB No. ANA 236540, the December 27, 1993 order of the Board is annulled, and the matter of respondents' entitlement to discovery is remanded to the Board for further proceedings pursuant to the guidelines established in this opinion.

In Ameri-Medical Corp. v. Workers' Compensation Appeals Board, WCAB No. LBO 218124, the February 18, 1994, order of the Board is annulled. Transamerica has withdrawn its subpoena and motions to compel and produce. However, should the Board be required to rule on a renewed

request for discovery, the issue of respondents' entitlement to that discovery must be considered within the guidelines established in this opinion.

Klein, P. J., and Croskey, J., concurred.

Petitions for a rehearing was denied March 28, 1996, and the opinion was modified to read as printed above.